**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

**SEPTEMBER 2018 TERM**

_____

No. 18-0816

_____

**FILED**

**October 11, 2018**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA ex rel. MARGARET L. WORKMAN,**
Petitioner

**V.**

**MITCH CARMICHAEL, as President of the Senate; DONNA J. BOLEY, as President Pro Tempore of the Senate; RYAN FERNS, as Senate Majority Leader, LEE CASSIS, Clerk of the Senate; and the WEST VIRGINIA SENATE,**
Respondents

_____

**WRIT OF PROHIBITION GRANTED**

_____

**Filed: October 11, 2018**

Marc E. Williams
Melissa Foster Bird
Thomas M. Hancock
Christopher D. Smith
Nelson Mullins Riley & Scarborough
Huntington, West Virginia
Attorneys for Petitioner

J. Mark Adkins
Floyd E. Boone, Jr.
Richard R. Heath, Jr.
Lara Brandfass
Bowles Rice
Charleston, West Virginia
Attorneys for Respondents

**ACTING CHIEF JUSTICE JAMES A. MATISH delivered the Opinion of the Court.**

**ACTING JUSTICE LOUIS H. BLOOM concurs in part and dissents in part and reserves the right to file a separate opinion.**

**ACTING JUSTICE JACOB E. REGER concurs in part and dissents in part and reserves the right to file a separate opinion.**

**CHIEF JUSTICE WORKMAN is disqualified.**

**JUSTICE ALLEN H. LOUGHRY II suspended, therefore not participating**

**JUSTICE ELIZABETH WALKER is disqualified.**

**JUSTICE PAUL T. FARRELL sitting by temporary assignment is disqualified.**

**JUSTICE TIM ARMSTEAD did not participate.**

**JUSTICE EVAN JENKINS did not participate.**

**ACTING JUSTICE RUDOLPH J. MURENSKY, II, and ACTING JUSTICE RONALD E. WILSON sitting by temporary assignment.**

SYLLABUS BY THE COURT

1.      In the absence of legislation providing for an appeal in an impeachment proceeding under Article IV, § 9 of the Constitution of West Virginia, this Court does not have jurisdiction over an appeal of a final decision by the Court of Impeachment.

2.      An officer of the state who has been impeached under Article IV, § 9 of the Constitution of West Virginia, may seek redress for an alleged violation of his or her constitutional rights in the impeachment proceedings, by filing a petition for an extraordinary writ under the original jurisdiction of this Court.

3.      To the extent that syllabus point 3 of *State ex rel. Holmes v. Clawges*, 226 W. Va. 479, 702 S.E.2d 611 (2010) may be interpreted as prohibiting this Court from exercising its constitutional authority to issue an extraordinary writ against the Legislature when the law requires, it is disapproved.

4.      West Virginia Code § 51-9-10 (1991) violates the Separation of Powers Clause of Article V, § 1 of the West Virginia Constitution, insofar as that statute seeks to regulate judicial appointment matters that are regulated exclusively by this Court

i

pursuant to Article VIII, § 3 and § 8 of the West Virginia Constitution. Consequently, W.Va. Code § 51-9-10, in its entirety, is unconstitutional and unenforceable.

5.      This Court has exclusive authority and jurisdiction under Article VIII, § 8 of the West Virginia Constitution and the rules promulgated thereunder, to sanction a judicial officer for a violation of a Canon of the West Virginia Code of Judicial Conduct. Therefore, the Separation of Powers Clause of Article V, § 1 of the West Virginia Constitution prohibits the Court of Impeachment from prosecuting a judicial officer for an alleged violation of the Code of Judicial Conduct.

6.      The Due Process Clause of Article III, § 10 of the Constitution of West Virginia requires the House of Delegates follow the procedures that it creates to impeach a public officer. Failure to follow such rules will invalidate all Articles of Impeachment that it returns against a public officer.

Matish, Acting Chief Justice:

The Petitioner, the Honorable Margaret L. Workman, Chief Justice of the Supreme Court of Appeals of West Virginia, brought this proceeding under the original jurisdiction of this Court as a petition for a writ of mandamus that seeks to halt impeachment proceedings against her. The Respondents named in the petition are the Honorable Mitch Carmichael, President of the Senate; the Honorable Donna J. Boley, President Pro Tempore of the Senate; the Honorable Ryan Ferns, Senate Majority Leader; the Honorable Lee Cassis, Clerk of the Senate; and the West Virginia Senate.[1] The Petitioner seeks to have this Court prohibit the Respondents from prosecuting her under three Articles of Impeachment returned against her by the West Virginia House of Delegates. The Petitioner has briefed the following issues to support her contention that

---

[1] It will be noted that the Petitioner failed to name as a respondent the Acting Chief Justice, the Honorable Justice Paul T. Farrell, that is presiding over the impeachment proceeding that she seeks to halt. Ordinarily the judicial officer presiding over a proceeding that is being challenged is named as a party in a proceeding in this Court. However, the omission of Acting Chief Justice Farrell as a named party in this matter is not fatal to the relief that is being requested. Pursuant to rules adopted by the Senate to govern the impeachment proceedings, the Acting Chief Justice was stripped of his judicial authority over motions, objections and procedural questions. This authority was removed under Rule 23(a) of Senate Resolution 203 as follows:

> All motions, objections, and procedural questions made by the parties shall be addressed to the Presiding Officer [Acting Chief Justice], who shall decide the motion, objection, or procedural question: Provided, That a vote to overturn the Presiding Officer's decision on any motion, objection, or procedural question shall be taken, without debate, on the demand of any Senator sustained by one tenth of the Senators present, and an affirmative vote of a majority of the Senators present and voting shall overturn the Presiding Officer's decision on the motion, objection, or procedural question.

As a result of Rule 23(a) Acting Chief Justice Farrell is not an indispensible party to this proceeding.

1

she is entitled to the relief sought. The Petitioner has alleged several issues which we have distilled to the essence as alleging that the Articles of Impeachment against her violate the Constitution of West Virginia because (1) an administrative rule promulgated by the Supreme Court supersede statutes in conflict with them; (2) the determination of a violation of the West Virginia Code of Judicial Conduct rests exclusively with the Supreme Court; (3) the Articles of Impeachment were filed in violation of provisions of House Resolution 201. Upon careful review of the briefs, the appendix record, and the applicable legal authority, we grant relief as outlined in this opinion.[2]

**INTRODUCTION**

Although the Petitioner in this matter requested oral argument under Rule 20 of the Rules of Appellate Procedure, and even though this case presents issues of first impression, raises constitutional issues, and is of fundamental public importance, the Respondents, however, waived that right as follows:

> Oral argument is unnecessary because no rule to show cause is warranted. This case presents the straightforward application of unambiguous provisions of the Constitution of West Virginia that, under governing precedent of this Court, the Supreme Court of the United States and courts across the nation unquestionably affirm the West Virginia Senate's role as the Court of Impeachment.

---

[2] We are compelled at the outset to note that this Court takes umbrage with the tone of the Respondents brief, insofar as it asserts "that a constitutional crisis over the separation of powers between the Legislature and Judicial Branches" would occur if this Court ruled against them. This Court is the arbiter of the law. Our function is to keep the scales of justice balanced, not tilted in favor of a party out of fear of retribution by that party. We resolve disputes based upon an unbiased application of the law.

2

This Court further notes that the Respondents declined to address the merits of the Petitioner's arguments. The Respondents stated the following:

> At the outset, it important to note that Respondents take no position with respect to facts as laid out by Petitioner, or the substantive merits of the legal arguments raised in the Petition. In fact, it is constitutionally impermissible for Respondents to do so, as they are currently sitting as a Court of Impeachment in judgment of Petitioner for the allegations made in the Articles adopted by the House.

The Respondents have not cited to any constitutional provision which prevents them from responding directly or through the Board of Managers (the prosecutors), to the merits of the Petitioner's arguments. It is expressly provided in Rule 16(g) of the Rules of Appellate Procedure that "[i]f the response does not contain an argument in response to a question presented by the petition, the Court will assume that the respondent agrees with the petitioner's view of the issue." In light of the Respondent's waiver of oral argument and refusal to address the merits of the Petitioner's arguments, this Court exercises its discretion to not require oral argument and will rule upon the written Petition, Response, Reply, and various appendices.[3]

Our forefathers in establishing this Country, as well as the leaders who established the framework for our State, had the forethought to put a procedure in place to address issues that could arise in the future; in the ensuing years that system has served us well. What our forefathers did not envision is the fact that subsequent leaders would not have

---

[3] This Court is aware that transparency is important. However, the Respondents have closed the door on themselves by declining to have oral arguments and taking the untenable position of not responding to the merits of the arguments. This Court would have appreciated well-researched arguments from the Respondents on the merits of the issues.

the ability or willingness to read, understand, or to follow those guidelines. The problem we have today is that people do not bother to read the rules, or if they read them, they decide the rules do not apply to them.

There is no question that a governor, if duly qualified and serving, can call a special session of the Legislature. There is no question that the House of Delegates has the right to adopt a Resolution and Articles of a Bill of Impeachment. There is no question that the Senate is the body which conducts the trial of impeachment and can establish its own rules for that trial and that it must be presided over by a member of this Court. This Court should not intervene with any of those proceedings because of the separation of powers doctrine, and no one branch may usurp the power of any other co-equal branch of government. However, when our constitutional process is violated, this Court must act when called upon.

Fundamental fairness requires this Court to review what has happened in this state over the last several months when all of the procedural safeguards that are built into this system have not been followed. In this case, there has been a rush to judgment to get to a certain point without following all of the necessary rules. This case is not about whether or not a Justice of the Supreme Court of Appeals of West Virginia can or should be impeached; but rather it is about the fact that to do so, it must be done correctly and constitutionally with due process. We are a nation of laws and not of men, and the rule of law must be followed.

By the same token, the separation of powers doctrine works six ways. The Courts may not be involved in legislative or executive acts. The Executive may not interfere

4

with judicial or legislative acts. So the Legislature should not be dealing with the Code of Judicial Conduct, which authority is limited to the Supreme Court of Appeals.

The greatest fear we should have in this country today is ourselves. If we do not stop the infighting, work together, and follow the rules; if we do not use social media for good rather than use it to destroy; then in the process, we will destroy ourselves.

# I.

## FACTUAL AND PROCEDURAL HISTORY

The Petitioner was appointed as a judge to the Circuit Court of Kanawha County, by former Governor John D. Rockefeller, IV, on November 16, 1981. She was later elected in 1982 by the voters to fill out the remainder of the unexpired term of her appointment. She was subsequently elected again in 1984 for a full term. In 1988, the Petitioner was elected by the voters to fill a vacancy on the West Virginia Supreme Court of Appeals. She served a full term and left office in 2000. The Petitioner ran again for a position on the Supreme Court in 2008 and won.

In late 2017, the local media began publicizing reports of their investigations into the costs for renovating the offices of the Supreme Court Justices. Those publicized reports led to an investigation by the Legislative Auditor into the spending practices of the Supreme Court in general. The Auditor's office issued a report in April of 2018. This report was focused on the conduct of Justice Allen Loughry and Justice Menis Ketchum. The report concluded that both Justices may have used state property for personal gain in violation of the state Ethics Act. The report indicated that the matter was referred to the

West Virginia Ethics Commission for further investigation.[4]  In June of 2018 the Judicial

Investigation Commission charged Justice Loughry with 32 violations of the Code of

Judicial Conduct and the Rules of Professional Conduct. Justice Loughry was

subsequently indicted by the federal government on 22 charges.[5]

On June 25, 2018, Governor Jim Justice issued a Proclamation  calling the

Legislature to convene in a second extraordinary session to consider the following:

> First: Matters relating to the removal of one or more Justices of the
> Supreme Court of Appeals of West Virginia, including, but not limited to,
> censure, impeachment, trial, conviction, and disqualification; and

> Second: Legislation authorizing and appropriating the expenditure of public
> funds to pay the expenses for the Extraordinary Session.

Pursuant to this Proclamation, the Legislature convened on June 26, 2018, to carry out

the task outlined therein.

The record indicates that on June 26, 2018, the House of Delegates adopted House

Resolution 201. This Resolution empowered the House Committee on the Judiciary to

investigate impeachable offenses against the Petitioner and the other four Justices of the

Supreme Court.[6] Under the Resolution, the Judiciary Committee was required to report to

the House of Delegates its findings of facts and any recommendations consistent with

---

[4] The Auditor's office issued a second report involving the Petitioner, Justice Robin Davis and Justice Elizabeth Walker. That report did not recommend an ethics investigation of those Justices.

[5] Additional charges were later brought against Justice Loughry. He was suspended from office.

[6] On July 11, 2018 Justice Ketchum resigned/retired effective July 27, 2018. As a result of his decision the Judiciary Committee did not consider impeachment offenses against him.

those findings of fact; and, if the recommendation was that of impeachment of any of the Justices, the Committee had to present to the House of Delegates a proposed resolution of impeachment and proposed articles of impeachment. Upon receipt of a proposed Resolution of Impeachment and Articles of Impeachment by the House of Delegates, Resolution 201 authorized the House to adopt a Resolution of Impeachment and formal articles of impeachment as prepared by the Judiciary Committee, and deliver the same to the Senate for consideration.

The Judiciary Committee conducted impeachment hearings between July 12, 2018 and August 6, 2018. On August 7, 2018, the Judiciary Committee adopted fourteen Articles of Impeachment. The Petitioner was named in four of the Articles of Impeachment. On August 13, 2013, the House of Delegates voted to approve only eleven of the Articles of Impeachment. The Petitioner was impeached on three of the Articles of Impeachment.[7] First, the Petitioner and Justice Davis were named in Article IV,[8] which alleged that they improperly authorized the overpayment of senior-status judges.[9] Second, the Petitioner was named exclusively in Article VI, which alleged that she improperly authorized the overpayment of senior-status judges.[10] Third, the Petitioner was named, along with three other justices, in Article XIV, which set out numerous allegations

---

[7] Justice Walker was named in 1 Article; Justice Davis was named in 4 Articles; and Justice Loughry was named in 7 Articles.

[8] Justice Davis retired from office on August 13.

[9] The text of the Article is set out in the Discussion section of the opinion.

[10] The text of the Article is set out in the Discussion section of the opinion.

against them which included charges that they failed to implement various administrative policies and procedures.[11]

Subsequent to the House of Delegates' adoption of the Articles of Impeachment they were submitted to the Senate for the purpose of conducting a trial. On August 20, 2018 the Senate adopted Senate Resolution 203, which set forth the rules of procedure for the impeachment trial. A pre-trial conference was held on September 11, 2018. At that conference the Petitioner, Justice Walker, and the Board of Managers submitted a "Proposed Stipulation and Agreement of Parties" that would have required the charges against both of them be dismissed.[12] The Senate voted to reject the settlement offer. Thereafter Acting Chief Justice Farrell set a separate trial date for the Petitioner on October 15, 2018. The Petitioner subsequently filed this proceeding to have the Articles of Impeachment against her dismissed.

## II.

### THIS COURT'S JURISDICTION TO ADDRESS CONSTITUTIONAL ISSUES ARISING FROM THE COURT OF IMPEACHMENT

Before we examine the merits of the issues presented we must first determine whether this Court has jurisdiction over issues arising out of a legislative impeachment

---

[11] The text of the Article is set out in the Discussion section of the opinion.

[12] The Board of Managers are "a group of members of the House of Delegates authorized by that body to serve as prosecutors before the Senate in a trial of impeachment." Rule 1, Senate Resolution 203.

proceeding. The Respondents contend that this Court does not have jurisdiction over the impeachment proceeding.[13] This is an issue of first impression for this Court.

Resolution of this issue requires an analysis of constitutional principles. In undertaking our analysis we are reminded that the United States Supreme Court stated in *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), that the determination of whether a matter is exclusively committed by the constitution to another branch of government "is itself a delicate exercise in constitutional interpretation and is a responsibility of this Court as ultimate interpreter of the Constitution." We are also guided by the principle that

> A constitution is the fundamental law by which all people of the state are governed. It is the very genesis of government. Unlike ordinary legislation, a constitution is enacted by the people themselves in their sovereign capacity and is therefore the paramount law.

*State ex rel. Smith v. Gore*, 150 W.Va. 71, 77, 143 S.E.2d 791, 795 (1965). Further,

---

[13] One of the arguments made by the Respondents is that this Court should not address the merits of the Petitioner's arguments, because she has raised a similar challenge to the Articles of Impeachment in the proceeding pending before them that has not been ruled upon. Ordinarily this Court would defer to a lower tribunals ruling on a matter before this Court will address it. However, we have carved out a narrow exception to this general rule. In this regard, we have held that "[a] constitutional issue that was not properly preserved at the trial court level may, in the discretion of this Court, be addressed on appeal when the constitutional issue is the controlling issue in the resolution of the case." Syl. pt. 2, *Louk v. Cormier*, 218 W.Va. 81, 622 S.E.2d 788 (2005). See *Simpson v. W. Virginia Office of Ins. Com'r*, 223 W. Va. 495, 504, 678 S.E.2d 1, 10 (2009) ("Nevertheless, we may consider this constitutional issue for the first time on appeal because it is central to our resolution of this case."); *State v. Allen*, 208 W. Va. 144, 151 n.12, 539 S.E.2d 87, 94 n.12 (1999) ("this Court may, under the appropriate circumstances, consider an issue initially presented for consideration on appeal."). We exercise our discretion to address the merits of the constitutional issues presented in this matter. See also, *State ex rel. Bd. of Educ. of Kanawha Cty. v. Casey*, 176 W. Va. 733, 735, 349 S.E.2d 436, 438 (1986) (recognizing that exhaustion of an alternative remedy is not required "where resort to available procedures would be an exercise in futility.").

It is axiomatic that our Constitution is a living document that must be viewed in light of modern realities. Reasonable construction of our Constitution ... permits evolution and adjustment to changing conditions as well as to a varied set of facts.... The solution [to problems of constitutional interpretation] must be found in a study of the specific provision of the Constitution and the best method [under current conditions] to further advance the goals of the framers in adopting such a provision.

*State ex rel. McGraw v. Burton*, 212 W. Va. 23, 36, 569 S.E.2d 99, 112 (2002) (internal quotation marks and citation omitted).

As an initial matter, we observe that "[q]uestions of constitutional construction are in the main governed by the same general rules applied in statutory construction." Syl. pt. 1, *Winkler v. State Sch. Bldg. Auth.*, 189 W.Va. 748, 434 S.E.2d 420 (1993). We have held that "[t]he object of construction, as applied to written constitutions, is to give effect to the intent of the people in adopting it." Syl. pt. 3, *Diamond v. Parkersburg–Aetna Corp.*, 146 W.Va. 543, 122 S.E.2d 436 (1961). This Court held in syllabus point 3 of *State ex rel. Smith v. Gore*, 150 W. Va. 71, 143 S.E.2d 791 (1965) that "[w]here a provision of a constitution is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed." Therefore, "[i]f a constitutional provision is clear in its terms, and the intention of the electorate is clearly embraced in the language of the provision itself, this Court must apply and not interpret the provision." Syl. pt. 1, *State ex rel. Trent v. Sims*, 138 W.Va. 244, 77 S.E.2d 122 (1953). On the other hand, "if the language of the constitutional provision is ambiguous, then the ordinary principles employed in statutory construction must be applied to ascertain such intent." *State ex rel. Forbes v. Caperton*, 198 W.Va. 474, 480, 481 S.E.2d 780, 786 (1996) (internal quotations and citations omitted). An ambiguous provision in a

constitution "requires interpretation consistent with the intent of both the drafters and the electorate." *State ex rel. Brotherton v. Blankenship*, 157 W. Va. 100, 127, 207 S.E.2d 421, 436-437 (1973). Although we are empowered with the authority "to construe, interpret and apply provisions of the Constitution, ... [we] may not add to, distort or ignore the plain mandates thereof." *State ex rel. Bagley v. Blankenship*, 161 W.Va. 630, 643, 246 S.E.2d 99, 107 (1978).

It is axiomatic that "in every case involving the application or interpretation of a constitutional provision, analysis must begin with the language of the constitutional provision itself." *State ex rel. Mountaineer Park, Inc. v. Polan*, 190 W.Va. 276, 283, 438 S.E.2d 308, 315 (1993). The framework for impeaching and removing an officer of the state is set out under Article IV, § 9 of the Constitution of West Virginia. The full text of Section 9 provides as follows:

> Any officer of the state may be impeached for maladministration, corruption, incompetency, gross immorality, neglect of duty, or any high crime or misdemeanor. The House of Delegates shall have the sole power of impeachment. The Senate shall have the sole power to try impeachments and no person shall be convicted without the concurrence of two thirds of the members elected thereto. When sitting as a court of impeachment, the president of the supreme court of appeals, or, if from any cause it be improper for him to act, then any other judge of that court,[14] to be designated by it, shall preside; and the senators shall be on oath or affirmation, to do justice according to law and evidence. Judgment in cases of impeachment shall not extend further than to removal from office, and disqualification to hold any office of honor, trust or profit, under the state; but the party convicted shall be liable to indictment, trial judgment, and punishment according to law. The Senate may sit during the recess of the Legislature, for the trial of impeachments.

---

[14] "Prior to the Judicial Reorganization Amendment [of 1974], the Justices of the Court were referred to as 'Judges' and the Chief Justice was referred to as 'President.'" *State v. McKinley*, 234 W. Va. 143, 150 n.3, 764 S.E.2d 303, 310 n.3 (2014).

Pursuant to Section 9 "[t]he House of Delegates has the sole power of impeachment, and the Senate the sole power to try impeachments." *Slack v. Jacob*, 1875 W.L. 3439, 8 W. Va. 612, 664 (1875). To facilitate the trial of an impeachment proceeding Section 9 created a Court of Impeachment.

It is clear from the text of Section 9 that it does not provide this Court with jurisdiction over an appeal of a final decision by the Court of Impeachment.[15] Consequently, and we so hold, in the absence of legislation providing for an appeal in an impeachment proceeding under Article IV, § 9 of the Constitution of West Virginia, this Court does not have jurisdiction over an appeal of a final decision by the Court of Impeachment.

Although it is clear that an appeal is not authorized from a decision by the Court of Impeachment, we do find under the plain language of Section 9, the actions or inactions of the Court of Impeachment may be subject to a proceeding under the original jurisdiction of this Court.[16] The authority for this proposition is contained in the Law and Evidence Clause found in Section 9, which states: "the senators shall … do justice according to law and evidence." The Law and Evidence Clause of Section 9 uses the word "shall" in requiring the Court of Impeachment to follow the law. We have

---

[15] The Constitution of West Virginia grants authority to the Legislature to provide appellate jurisdiction to this Court for areas of law that are not set out in the constitution. See W.Va. Const. Art. VIII, § 3 ([The Supreme Court] "shall have such other appellate jurisdiction, in both civil and criminal cases, as may be prescribed by law.").

[16] Article VIII, § 3 of the Constitution of West Virginia provides that "[t]he supreme court of appeals shall have original jurisdiction of proceedings in habeas corpus, mandamus, prohibition and certiorari."

12

recognized that "[t]he word 'shall,' ... should be afforded a mandatory connotation[,] and when used in constitutions and statutes, [it] leaves no way open for the substitution of discretion." *Silveti v. Ohio Valley Nursing Home, Inc.*, 240 W. Va. 468, 813 S.E.2d 121, 125 (2018) (internal quotation marks and citations omitted). See Syl. pt. 3, *State ex rel. Trent v. Sims*, 138 W.Va. 244, 77 S.E.2d 122 (1953) ("As used in constitutional provisions, the word 'shall' is generally used in the imperative or mandatory sense."). Insofar as the Law and Evidence Clause imposes a mandatory duty on the Court of Impeachment to follow the law, there is an implicit right of an impeached official to have access to the courts to seek redress, if he or she believes actions or inactions by the Court of Impeachment violate his or her rights under the law.[17]

---

[17] It must be clearly understood that the Law and Evidence Clause is not superfluous language. Under the 1863 Constitution of West Virginia the impeachment provision was set out in Article III, § 10. The original version of the impeachment provision did not contain a Law and Evidence Clause. The 1863 version of the impeachment provision read as follows:

> Any officer of the State may be impeached for maladministration, corruption, incompetence, neglect of duty, or any high crime or misdemeanor. The house of delegates shall have the sole power of impeachment. The senate shall have the sole power to try impeachments. When sitting for that purpose, the senators shall be on oath or affirmation; and no persons shall be convicted without the concurrence of two-thirds of the members present. Judgment in cases of impeachment shall not extend further than to removal from office and disqualification to hold any office of honor, trust or profit, under the State; but the party convicted shall, nevertheless, be liable and subject to indictment, trial judgment, and punishment according to law. The Senate may sit during the recess of the legislature, for the trial of impeachments.

The Law and Evidence Clause was specifically added to the impeachment provision in the constitution of 1872. The affirmative creation and placement of the Law and Evidence Clause in the new constitution supports the significance this Court has given to that clause. A similar Law and Evidence Clause appears in the impeachment laws of 11

The implicit right of redress in the courts found in the Law and Evidence Clause, is expressly provided for in Article III, § 17 of the Constitution of West Virginia. Section 17 provides as follows:

> The courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

The Certain Remedy Clause of Section 17 has been found to mean that "[t]he framers of the West Virginia Constitution provided citizens who have been wronged with rights to pursue a remedy for that wrong in the court system." *Bias v. E. Associated Coal Corp.*, 220 W. Va. 190, 204, 640 S.E.2d 540, 554 (2006) (Starcher, J., dissenting). See *O'Neil v. City of Parkersburg*, 160 W.Va. 694, 697, 237 S.E.2d 504, 506 (1977) ("[T]he concept of American justice ... pronounces that for every wrong there is a remedy. It is incompatible with this concept to deprive a wrongfully injured party of a remedy[.]"); *Gardner v. Buckeye Sav. & Loan Co.*, 108 W.Va. 673, 680, 152 S.E. 530, 533 (1930) ("It is the proud boast of all lovers of justice that for every wrong there is a remedy."); *Lambert v. Brewster*, 97 W.Va. 124, 138, 125 S.E. 244, 249 (1924) ("As for public policy, the

states. See Ariz. Const. Art. VIII, Pt. 2 § 1 (1910); Colo. Const. Art. XIII, § 1 (1876); Kan. Const. Art. II, § 27 (1861); Md. Const. Art. III, § 26 (1867); Miss. Const. Art. 4, § 49 (1890); Nev. Const. Art. VII, § 1 (1864); N.D. Cent. Code Ann. § 44-09-02 (1943); Ohio Const. Art. II, § 23 (1851); Utah Const. Art. VI, § 18 (1953); Wash. Const. Art. V, § 1 (1889); Wyo. Const. Art. III, § 17 (2016). There does not appear to be any judicial decisions from those jurisdictions addressing the application of the Law and Evidence Clause. It is also worth noting that under the 1863 Constitution of West Virginia there was no provision for a presiding judicial officer. The 1872 Constitution of West Virginia added the provision requiring a judicial officer preside over an impeachment proceeding. This requirement is further evidence that an impeachment proceeding was not beyond the jurisdiction of this Court, insofar as it solidified the quasi-judicial nature of the proceeding.

strongest policy which appeals to us is that fundamental theory of the common law that for every wrong there should be a remedy."). In the leading treatise on the Constitution of West Virginia, the following is said,

> The second clause of section 17, providing that all persons "shall have remedy by due course of law" … limits … the ability of the government to constrict an individual's right to invoke the judicial process[.]

Robert M. Bastress, *The West Virginia State Constitution*, at 124 (2011).

This Court has held that "enforcement of rights secured by the Constitution of this great State is engrained in this Court's inherent duty to neutrally and impartially interpret and apply the law." *State ex rel. Biafore v. Tomblin*, 236 W. Va. 528, 544, 782 S.E.2d 223, 239 (2016). That is, "[c]ourts are not concerned with the wisdom or expediencies of constitutional provisions, and the duty of the judiciary is merely to carry out the provisions of the plain language stated in the constitution." Syl. pt. 3, *State ex rel. Casey v. Pauley*, 158 W.Va. 298, 210 S.E.2d 649 (1975).

Insofar as an officer of the state facing impeachment in the Court of Impeachment has a constitutional right to seek redress for an alleged violation of his or her rights by that court, we now hold that an officer of the state who has been impeached under Article IV, § 9 of the Constitution of West Virginia, may seek redress for an alleged violation of his or her constitutional rights in the impeachment proceedings, by filing a petition for an extraordinary writ under the original jurisdiction of this Court.[18] See *Kinsella v. Jaekle*,

---

[18] The Respondents have argued in a footnote of their brief that "the Impeachment Clause vests absolute discretion in the context of impeachment in the Legislature." The Respondents cite to the decision in *Goff v. Wilson*, 32 W. Va. 393, 9 S.E. 26 (1889) as support for that proposition. *Goff* does not support the proposition and is not remotely

15

192 Conn. 704, 723, 475 A.2d 243, 253 (1984) ("A court acting under the judicial power of … the constitution may exercise jurisdiction over a controversy arising out of impeachment proceedings only if the legislature's action is clearly outside the confines of its constitutional jurisdiction to impeach any executive or judicial officer; or egregious and otherwise irreparable violations of state or federal constitutional guarantees are being or have been committed by such proceedings."); *Smith v. Brantley*, 400 So. 2d 443, 449 (Fla. 1981) ("The issue of subject matter jurisdiction for impeachment is properly determined by the judiciary, of course. Our conclusion on this question is that one must be such an officer to be impeachable."); *Dauphin County Grand Jury Investigation Proceedings*, 332 Pa. 342, 345, 2 A.2d 802, 803 (1938) ("the courts have no jurisdiction in impeachment proceedings, and no control over their conduct, *so long as actions taken are within constitutional lines*.") (emphasis added); *People ex rel. Robin v. Hayes*, 82 Misc. 165, 172–73, 143 N.Y.S. 325, 330 (Sup. Ct. 1913) ("[A court] has no jurisdiction to inquire into the sufficiency of charges for which a Governor may be impeached, nor, I take it, whether the proceedings looking to that end were properly conducted, *unless at their foundation, in their exercise, constitutional guaranties are broken down or limitations ignored*.") (emphasis added).[19]

---

relevant to this case. In *Goff* the petitioner wanted this Court to declare that he received the highest number of votes for the office of governor, before the Legislature carried out its duties in certifying the results of the election. We declined to intervene because no authority permitted this Court to intervene. Contrary to the Respondents' assertion, that the Legislature has absolute discretion in impeachment matters, the Law and Evidence Clause of the constitution strips the Legislature of "absolute" discretion in such matters.

[19] This is not the first time that we have permitted access to this Court, under our original jurisdiction, when no right of appeal existed from a quasi-judicial proceeding. For

It will be noted that this Court held in syllabus point 3 of *State ex rel. Holmes v. Clawges*, 226 W. Va. 479, 702 S.E.2d 611 (2010) that "[u]nder the Separation of Powers doctrine, Article V, Section 1 of the Constitution of West Virginia, courts have no authority—by mandamus, prohibition, contempt or otherwise—to interfere with the proceedings of either house of the Legislature." This holding is not applicable to the issue under consideration in the instant matter.[20] In *Holmes* the Court was called upon to address the issue of a circuit court issuing an order that required the Clerk of the Senate and the Clerk of the House of Delegates remove references to a pardon by the Governor in the official journals of the Senate and the House of Delegates. When the Clerks refused to obey the order, the circuit court issued a rule to show cause as to why they should not

---

example, a litigant in the former Court of Claims had no right to appeal a decision from that tribunal. However, this Court found that constitutional principles permitted access to this Court under our original jurisdiction:

> [T]his Court obviously may review decisions of the court of claims under the original jurisdiction granted by article VIII, section 2 of our Constitution, through proceedings in mandamus, prohibition, or certiorari. Review in this fashion is necessary because the court of claims is not a judicial body, but an entity created by and otherwise accountable only to the Legislature, and judicial recourse must be available to protect basic principles of separation of powers.

*G.M. McCrossin, Inc. v. W. Virginia Bd. of Regents*, 177 W. Va. 539, 541 n.3, 355 S.E.2d 32, 33 n.3 (1987). See Syl. pt. 3, *City of Morgantown v. Ducker*, 153 W. Va. 121, 121, 168 S.E.2d 298, 299 (1969) ("Mandamus is the proper remedy to require the State Court of Claims to assume jurisdiction of a monetary claim against the Board of Governors of West Virginia University."). The Court of Claims was renamed in 2017 and is now called the "West Virginia Legislative Claims Commission." See W. Va. Code § 14-2-4 (2017).

[20] The Respondents cited to this case three times in their brief, but did not provide any discussion of the case.

be held in contempt. This Court determined that the judicial order encroached on the

exclusive authority of the Legislature to maintain journals:

> [T]he Clerks argue that it is beyond the authority of a circuit court to compel them to alter the Journals, whether in their printed form or in their electronic form published on the internet. The Clerks generally assert that the circuit court exceeded its jurisdiction, because the Journals are a protected legislative function under the Constitution of West Virginia. The Constitution of West Virginia vests the State's legislative power in a Senate and a House of Delegates. W.Va. Const., Art. VI, § 1. Each house of the Legislature is charged with determining its own internal rules for its proceedings and with choosing its own officers. W.Va. Const., Art. VI, § 24.
> The Constitution mandates that each house must keep and publish a "journal of its proceedings." Article VI, Section 41 states:
>> Each house shall keep a journal of its proceedings, and cause the same to be published from time to time, and all bills and joint resolutions shall be described therein, as well by their title as their number, and the yeas and nays on any question, if called for by one tenth of those present shall be entered on the journal.
> A variation of this mandate has been in our Constitution since the founding of our State in 1863. The founding fathers indicated during the constitutional convention that there are two goals underlying this provision: to ensure that the votes of legislators are correctly recorded, and to make a public record of the actions of legislators.

*Holmes*, 226 W. Va. at 483–84, 702 S.E.2d at 615–16. The facts giving rise to syllabus

point 3 in *Holmes* clearly establish the limitations of that syllabus point. That is, the facts

of the case concerned a trial court interfering in legislative administrative matters when

no legal authority permitted such interference. Neither the opinion nor syllabus point 3

were intended to limit the authority of this Court to entertain an extraordinary writ against

the Legislature when the law permits. For example, the case of *State ex rel. Cooper v.*

*Tennant*, 229 W. Va. 585, 730 S.E.2d 368 (2012) involved several consolidated actions

for prohibition and mandamus against the Speaker of the House of Delegates and

18

government officials concerning the constitutionality of redistricting. This Court denied the writs and in doing so held that

> In the absence of constitutional infirmity, as the precedent evaluated above irrefutably establishes, the development and implementation of a legislative redistricting plan in the State of West Virginia are entirely within the province of the Legislature. The role of this Court is limited to a determination of whether the Legislature's actions have violated the West Virginia Constitution.

*Cooper*, 229 W. Va. at 614, 730 S.E.2d at 397. See *State ex rel. W. Virginia Citizen Action Grp. v. Tomblin*, 227 W. Va. 687, 715 S.E.2d 36 (2011) (granting mandamus in part against the Governor, Speaker of the House of Delegates and other government officials requiring a special election be called); *State ex rel. League of Women Voters of W. Virginia v. Tomblin*, 209 W. Va. 565, 578, 550 S.E.2d 355, 368 (2001) (finding that mandamus would be issued against the President of the Senate, Speaker of the House of Delegates and other government officials that required "the Legislature to only include as part of the budget digest information that has been the subject of discussion, debate, and decision prior to final legislative enactment of the budget bill."); *State ex rel. Meadows v. Hechler*, 195 W. Va. 11, 19, 462 S.E.2d 586, 594 (1995) granting mandamus against the President of the Senate and Speaker of the House of Delegates that required "the Legislature to promptly draft legislation to replace the unconstitutional section of article 29A and additionally, to consider passage of legislation that would exempt certain administrative regulations from conformance with APA implementation requirements, such as where compliance with federal law is mandated."). In view of the foregoing, we hold that to the extent that syllabus point 3 of *State ex rel. Holmes v. Clawges*, 226 W.

19

Va. 479, 702 S.E.2d 611 (2010) may be interpreted as prohibiting this Court from exercising its constitutional authority to issue an extraordinary writ against the Legislature when the law requires, it is disapproved.

The Respondents have cited to the decision in *Nixon v. United States*, 506 U.S. 224, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993) as authority for the proposition that the judiciary does not have jurisdiction over impeachment proceedings. In *Nixon*, a federal district judge was impeached and removed from office, in a proceeding in which the United States Senate allowed a committee to take testimony and gather evidence. The former judge filed a declaratory judgment action in a district court seeking a ruling that the Senate's failure to hold a full evidentiary hearing before the entire Senate violated its constitutional duty to "try" all impeachments. The District Court denied relief and dismissed the case. The Court of Appeals affirmed. The United States Supreme Court granted certiorari to determine whether the constitutional requirement that the Senate "try" cases of impeachment precludes the use of a committee to hear evidence. The opinion held that the issue presented could not be brought in federal court. The Court reasoned as follows:

> We agree with the Court of Appeals that opening the door of judicial review to the procedures used by the Senate in trying impeachments would "expose the political life of the country to months, or perhaps years, of chaos." This lack of finality would manifest itself most dramatically if the President were impeached. The legitimacy of any successor, and hence his effectiveness, would be impaired severely, not merely while the judicial process was running its course, but during any retrial that a differently constituted Senate might conduct if its first judgment of conviction were invalidated. Equally uncertain is the question of what relief a court may give other than simply setting aside the judgment of conviction. Could it

20

order the reinstatement of a convicted federal judge, or order Congress to create an additional judgeship if the seat had been filled in the interim?

*Nixon*, 506 U.S. at 236, 113 S. Ct. at 739.

The decision in *Nixon* is not controlling and is distinguishable. See *Peters v. Narick*, 165 W. Va. 622, 628 n.13, 270 S.E.2d 760, 764 n.13 (1980), modified on other grounds by *Israel by Israel v. W. Virginia Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 388 S.E.2d 480 (1989) ("States have the power to interpret state constitutional guarantees in a manner different than the United States Supreme Court has interpreted comparable federal constitutional guarantees."). The narrowly crafted  text of the impeachment provision found in the Constitution of the United States prevented the Supreme Court from finding a basis for allowing a constitutional challenge to the impeachment procedure adopted by the Senate. The text of the federal impeachment provision is found in Article I, § 3 of the Constitution of the United States and provides the following:

> The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.
> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

It is clear that Article 1, § 3 does not contain the Law and Evidence Clause that is found in Article IV, § 9 of the Constitution of West Virginia. Therefore, our constitution

21

provides greater impeachment protections than the Constitution of the United States.[21]

See *State ex rel. K.M. v. W. Virginia Dep't of Health & Human Res.*, 212 W. Va. 783, 794 n.15, 575 S.E.2d 393, 404 n.15 (2002) ("it is clear that our Constitution may offer greater protections than its federal counterpart."); *State ex rel. Carper v. W. Virginia Parole Bd.*, 203 W. Va. 583, 590 n.6, 509 S.E.2d 864, 871 n.6 (1998) ("This Court has determined repeatedly that the West Virginia Constitution may be more protective of individual rights than its federal counterpart."); *State v. Bonham*, 173 W. Va. 416, 418, 317 S.E.2d 501, 503 (1984) ("[T]he United States Supreme Court has also recognized that a state supreme court may set its own constitutional protections at a higher level than that accorded by the federal constitution. There are a number of cases where state supreme courts have set a higher level of protection under their own constitutions."); Syl. pt.2, *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979) ("The provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution."). Moreover, *Nixon* was not called upon to address the substantive type of issues presented in this case. The case was focused upon the right of the Senate to craft rules of procedure for impeachment.

The Respondents have cited to the decision in *In re Judicial Conduct Comm.*, 145 N.H. 108, 111, 751 A.2d 514, 516 (2000). In that case the New Hampshire House Judiciary Committee began an impeachment investigation into conduct by the state

---

[21] Even the Respondents have conceded in their brief that "West Virginia's Impeachment Clause is significantly broader than its counterpart in the United States Constitution."

22

Supreme Court chief justice and other members of that court. The state Supreme Court

Committee on Judicial Conduct filed a motion seeking an order requiring the House

Committee to allow it to attend any House Committee deposition of any Judicial Conduct

member or employee. The state Supreme Court held that the issue presented was a

nonjusticiable political question and therefore denied relief. However, the opinion was

clear in holding that the judiciary had authority to intervene in an impeachment

proceeding:

> The [House Judiciary Committee] first argues that the judicial branch lacks
> jurisdiction over any matter related to a legislative impeachment
> investigation. We disagree.
>> The investigative power of the Legislature, however
>> penetrating and persuasive its scope, is not an absolute right
>> but, like any right, is "limited by the neighborhood of
>> principles of policy which are other than those on which
>> [that] right is founded, and which become strong enough to
>> hold their own when a certain point is reached." United States
>> v. Rumely, 345 U.S. 41, 44 [73 S.Ct. 543, 97 L.Ed. 770];
>> Hudson Water Co. v. McCarter, 209 U.S. 349, 355 [28 S.Ct.
>> 529, 52 L.Ed. 828]. The contending principles involved here
>> are those underlying the power of the Legislature to
>> investigate on the one hand and those upon which are based
>> certain individual rights guaranteed to our citizens by the
>> State and National Constitutions.
> *Nelson v. Wyman*, 99 N.H. 33, 41, 105 A.2d 756, 764 (1954).
> ***
> The court system is available for adjudication of issues of constitutional or
> other fundamental rights.... In such circumstances, Part I, Article 17 of the
> New Hampshire Constitution does not deprive persons whose rights are
> violated from seeking judicial redress simply because the violation occurs
> in the course of an impeachment investigation.
> ***
> The constitutional authority of the House of Representatives to conduct
> impeachment proceedings without interference from the judicial branch is
> extensive, but not so extensive as to preclude this court's jurisdiction to hear
> matters arising from legislative impeachment proceedings. "It is the role of
> this court in our co-equal, tripartite form of government to interpret the

> Constitution and to resolve disputes arising under it." *Petition of Mone*, 143
> N.H. at 133, 719 A.2d at 631 (quoting *Monier*, 122 N.H. at 476, 446 A.2d
> at 455; citing *Merrill v. Sherburne*, 1 N.H. 199, 201-02 (1818)). However,
> upon briefing and argument, it is apparent that the specific issue raised by
> the JCC is nonjusticiable. Accordingly, the JCC's request for its special
> counsel to attend HJC depositions of JCC members and employees is
> denied.

*In re Judicial Conduct*, 145 N.H. at 110-113, 751 A.2d at 515. Although the Respondents

cited to the decision in *In re Judicial Conduct*, it is clear that the constitutional principles

of law discussed in the case are consistent with this Court's ruling, i.e., the judiciary may

intervene in an impeachment proceeding to protect constitutional rights.

The Respondents cited to the decision in *Larsen v. Senate of Pennsylvania*, 166

Pa. Cmwlth. 472, 646 A.2d 694 (1994) without any discussion. In *Larsen* a former justice

on the state Supreme Court was sentenced to removal from office by a trial court after he

was found guilty of an infamous crime. The former justice filed for a preliminary

injunction to prevent a senate impeachment trial and asserted numerous grounds for

relief, that included: (1) he was no longer in office and could not be removed by the

senate, (2) senate rules were unconstitutional, (3) the senate could not permit a committee

to hear the case, and (4) he was denied sufficient time to prepare. The court, relying on

the decision in *Nixon*, found that the state's impeachment clause was similar to the

federal clause and therefore denied relief. However, the opinion noted that the decision

by the state Supreme Court decision in *Dauphin County Grand Jury Investigation*

*Proceedings*, 332 Pa. 342, 345, 2 A.2d 802, 803 (1938) held that "the courts have no

jurisdiction in impeachment proceedings and no control over their conduct, so long as

actions taken are within constitutional lines..." *Larsen*, 166 Pa. Cmwlth. at 482, 646 A.2d

24

at 699. The opinion limited *Dauphin's* qualification on judicial intervention to impeachment proceedings that had ended. The decision in *Larsen* is distinguishable because that state's impeachment clause was aligned with the federal impeachment clause, and did not have a Law and Evidence Clause like the Constitution of West Virginia. Moreover, Larsen recognized that it could not overrule the state Supreme Court's ruling in *Dauphin*, which left open the door for intervention in an impeachment proceeding for "actions [not] taken within constitutional lines." *Larsen* limited intervention to post-impeachment.

The Respondents have also cited to the decision in *Mecham v. Arizona House of Representatives*, 162 Ariz. 267, 782 P.2d 1160 (1989). In that case the state Governor filed a petition for injunctive relief with the state Supreme Court, to prevent the state senate from conducting an impeachment trial against him until his criminal trial was over. The Governor also challenged the impeachment procedures. The state Supreme Court denied relief as follows:

> [W]e can only conclude that the power of impeachment is exclusively vested in the House of Representatives and the power of trial on articles of impeachment belongs solely to the Senate. The Senate's task is to determine if the Governor should be removed from office. Aside from disqualification from holding any other state position of "honor, trust, or profit," the Senate can impose no greater or lesser penalty than removal and can impose no criminal punishment. Trial in the Senate is a uniquely legislative and political function. It is not judicial.

*Mecham*, 156 Ariz. at 302, 751 P.2d at 962. The decision in *Mecham* is factually distinguishable because it did not involve allegations of a violation of substantive constitutional rights. More importantly, even though the court in *Mecham* denied the

25

requested relief, it made clear that the judiciary could intervene in an impeachment

proceeding to protect the constitutional rights of an impeached official:

> This Court does have power to ensure that the legislature follows the
> constitutional rules on impeachment. For instance, should the Senate
> attempt to try a state officer without the House first voting articles of
> impeachment, we would not hesitate to invalidate the results.

*Mecham*, 156 Ariz. at 302-303, 751 P.2d at 962-963. See *Mecham v. Gordon*, 162 Ariz.

267,  782 P.2d 1160 (1989) (declining to review impeachment of state Governor because

constitutional requirements were met).

In the instant proceeding the Petitioner has alleged that the impeachment charges

brought against her are unlawful and violate her constitutional rights. In view of the

above analysis, we have jurisdiction to consider the validity of these allegations.[22]

---

[22] The Respondents have argued that intervention in the impeachment proceeding violates the Guarantee Clause of the federal constitution. This clause provides as follows: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. Conts. Art. IV, § 4. The Respondents contend that the Guarantee Clause requires that a state have "separate and coequal branches" of government. In a convoluted  manner the Respondents contend that this Court's intervention in this matter would destroy the "separate and coequal branches" of government. The Respondents have not cited to an opinion by any court in the country that supports the proposition that issuance of a writ against another branch of government violates the Guarantee Clause. See *New York v. United States*, 505 U.S. 144, 184, 112 S. Ct. 2408, 2432, 120 L. Ed. 2d 120 (1992) ("In most of the cases in which the Court has been asked to apply the [Guarantee] Clause, the Court has found the claims presented to be nonjusticiable under the 'political question' doctrine."). We find no merit in the contention. Further, the issue of the separation of powers doctrine is fully addressed in the Discussion section of this opinion.

## III.

## STANDARD OF REVIEW

The Petitioner filed this matter seeking a writ of mandamus to prohibit enforcement of the Articles of Impeachment filed against her. This Court has explained that the function of mandamus is "the enforcement of an established right and the enforcement of a corresponding imperative duty created or imposed by law." *State ex rel. Ball v. Cummings*, 208 W. Va. 393, 398, 540 S.E.2d 917, 922 (1999). It was held in syllabus point two of *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969) that

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

In our review of the type of relief the Petitioner seeks we do not believe that mandamus is the appropriate remedy. "In appropriate situations, this Court has chosen to treat petitions for extraordinary relief according to the nature of the relief sought rather than the type of writ pursued." *State ex rel. TermNet Merch. Servs., Inc. v. Jordan*, 217 W. Va. 696, 699, 619 S.E.2d 209, 212 (2005). See *State ex rel. Potter v. Office of Disciplinary Counsel of State*, 226 W. Va. 1, 2 n.1, 697 S.E.2d 37, 38 n.1 (2010) ("this Court has, in past cases, treated a request for relief in prohibition as a petition for writ of mandamus if so warranted by the facts. Accordingly, we consider the present petition as a request for mandamus relief."); *State ex rel. Beirne v. Smith*, 214 W. Va. 771, 774, 591 S.E.2d 329, 332 (2003) ("Although Mr. Bradley brought his case as a petition for a writ

27

of prohibition, while Mr. Beirne requested a writ of mandamus, we choose to treat each as a petition for a writ of mandamus, because both petitioners wish to compel the Commissioner to do an affirmative act, i.e., pay benefits."); *State ex rel. Wyant v. Brotherton*, 214 W. Va. 434, 437, 589 S.E.2d 812, 815 (2003) ("Because we find this case to be in the nature of prohibition as opposed to mandamus, we will henceforth treat it as a petition for writ of prohibition."); *State ex rel. Riley v. Rudloff*, 212 W. Va. 767, 771–72, 575 S.E.2d 377, 381–82 (2002) ("This case was initially brought as a petition for writ of habeas corpus and/or mandamus. We granted the writ of habeas corpus, leaving for resolution only issues related to mandamus. Upon further consideration of the issues herein raised, however, we choose (as we have done in many appropriate cases) to treat this matter as a writ of prohibition."); *State ex rel. Sandy v. Johnson*, 212 W. Va. 343, 346, 571 S.E.2d 333, 336 (2002) ("Although this case was brought and granted as a petition for a writ of prohibition, we choose to treat it as a writ of mandamus action."); *State ex rel. Conley v. Hill*, 199 W.Va. 686, 687 n. 1, 487 S.E.2d 344, 345 n. 1 (1997) ("Although this case was brought and granted as a petition for mandamus, we choose to treat this matter as a writ of prohibition.").

In light of the issues raised by the Petitioner, we find that the more appropriate relief lies in a writ of prohibition. As a quasi-judicial body the Court of Impeachment is subject to the writ of prohibition. See *State ex rel. York v. W. Virginia Office of Disciplinary Counsel*, 231 W. Va. 183, 187 n.5, 744 S.E.2d 293, 297 n.5 (2013) ("prohibition lies against only judicial and 'quasi-judicial tribunals'[.]"); *Lewis v. Ho-Chunk Nation Election Bd.*, No. CV 06-109, 2007 WL 5297075 (Ho-Chunk Trial Ct.

28

Apr. 17, 2007) ("Therefore, the House may institute a case against a sitting president after determining probable cause of official wrongdoing, and, through designated managers, present the matter before the Senate, which assumes a quasi-judicial role in hearing and deliberating the charges."); *Mayor & City Council of Baltimore ex rel. Bd. of Police of City of Baltimore*, 1860 WL 3363, 15 Md. 376, 459 (1860) ("the present Constitution, invested the Legislature with quasi judicial functions, in exercising the power of impeachment and punishment, as therein provided."). The purpose of the writ is "to restrain inferior courts from *proceeding in causes over which they have no jurisdiction*[.]" Syl. pt. 1, in part, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953) (emphasis added). "The writ [of prohibition] lies as a matter of right whenever the inferior court (a) has not jurisdiction or (b) has jurisdiction but exceeds its legitimate powers and it matters not if the aggrieved party has some other remedy adequate or inadequate." *State ex rel. Nelson v. Frye*, 221 W. Va. 391, 394, 655 S.E.2d 137, 140 (2007) (internal citation and quotation marks omitted). See W. Va. Code § 53-1-1 (1923) ("The writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers.").

In syllabus point 4 of *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996), we set forth the following guideline for issuance of a writ of prohibition that does not involve lack of jurisdiction:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will

29

examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

With the foregoing in mind, we turn to the merits of the case.

## IV.

## DISCUSSION

The Petitioner has presented several issues that she contends ultimately require the dismissal of the impeachment charges against her.[23] All of the arguments presented by the Petitioner have one common thread: they expressly or implicitly contend that the charges are brought in violation of the separation of powers doctrine. Because this common theme permeates all of her arguments, we will provide a separate discussion of that doctrine before we address the merits of each individual issue.

---

[23] It was previously noted in this opinion that the Respondents chose not to address the merits of the issues presented. Even though the Respondents have not presented any sufficiently briefed legal arguments against the merits of Petitioner's arguments, they have referenced in general as to why certain claims by the Petitioner are not valid.

## A.

## The Separation of Powers Doctrine

"[T]he separation of powers doctrine [is] set forth in our State Constitution." *Erie Ins. Prop. & Cas. Co. v. King*, 236 W. Va. 323, 329, 779 S.E.2d 591, 597 (2015). The doctrine is set out in Article V, § 1 of the Constitution of West Virginia as follows:

> The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature.[24]

With regard to this provision, this Court has stated:

> The separation of these powers; the independence of one from the other; the requirement that one department shall not exercise or encroach upon the powers of the other two, is fundamental in our system of Government, State and Federal. Each acts, and is intended to act, as a check upon the others, and thus a balanced system is maintained. No theory of government has been more loudly acclaimed.

*State ex rel. W. Virginia Citizen Action Grp. v. Tomblin*, 227 W. Va. 687, 695, 715 S.E.2d 36, 44 (2011), quoting *State v. Huber*, 129 W.Va. 198, 209, 40 S.E.2d 11, 18 (1946). It has been held that "Article V, section 1 of the Constitution ... is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly

---

[24] Under the 1863 Constitution of West Virginia the separation of powers doctrine was found in Article I, § 4. The doctrine was worded slightly differently in its original form as follows:

> The legislative, executive and judicial departments of the government shall be separate and distinct. Neither shall exercise the powers properly belonging to either of the others. No person shall be invested with or exercise the powers of more than one of them at the same time.

The 1872 Constitution of West Virginia rewrote the separation of powers doctrine and placed it in its present location.

construed and closely followed." Syl. pt. 1, in part, *State ex rel. Barker v. Manchin*, 167

W. Va. 155, 279 S.E.2d 622 (1981). We have observed that

> The separation of powers doctrine implies that each branch of government
> has inherent power to "keep its own house in order," absent a specific grant
> of power to another branch…. This theory recognizes that each branch of
> government must have sufficient power to carry out its assigned tasks and
> that these constitutionally assigned tasks will be performed properly within
> the governmental branch itself.

*State v. Clark*, 232 W. Va. 480, 498, 752 S.E.2d 907, 925 (2013). Further, the "separation

of powers doctrine ensures that the three branches of government are distinct unto

themselves and that they, exclusively, exercise the rights and responsibilities reserved

unto them." *Simpson v. W. Virginia Office of Ins. Com'r*, 223 W. Va. 495, 505, 678

S.E.2d 1, 11 (2009). It has also been observed that

> The Separation of Powers Clause is not self-executing. Standing alone the
> doctrine has no force or effect. The Separation of Powers Clause is given
> life by each branch of government working exclusively within its
> constitutional domain and not encroaching upon the legitimate powers of
> any other branch of government. This is the essence and longevity of the
> doctrine.

*State ex rel. Affiliated Constr. Trades Found. v. Vieweg*, 205 W.Va. 687, 702, 520 S.E.2d

854, 869 (1999) (Davis, J., concurring). Professor Bastress has pointed out the purpose

and application of the separation of powers doctrine as follows:

> A system of divided powers advances several purposes. First, it helps to
> prevent government tyranny. By allocating the powers among the three
> branches and establishing a system of checks and balances, the constitution
> ensures that no one person or institution will become too powerful and
> allow ambition to supersede the public good....
> ***
> Thus, under the current doctrine, the court's role is to apply Article V to
> ensure that the system of government in the state remains balanced and that
> no one branch assumes powers specifically delegated to another, or

32

imposes burdens on another, or passes on its own responsibilities to another branch in such a manner as to threaten the balance of power, facilitate tyranny, or weaken the system of government.

Bastress, *West Virginia State Constitution*, at 141-144. See Syl. pt. 2, *Appalachian Power Co. v. Public Serv. Comm'n of West Virginia*, 170 W.Va. 757, 296 S.E.2d 887 (1982) ("Where there is a direct and fundamental encroachment by one branch of government into the traditional powers of another branch of government, this violates the separation of powers doctrine contained in Section 1 of Article V of the West Virginia Constitution.").

The decision in *State ex rel. Brotherton v. Blankenship*, 157 W. Va. 100, 207 S.E.2d 421 (1973) summarized the development of the separation of powers doctrine as follows:

From the time of its adherence to by Montesquieu, the author or at least an early supporter of the concept of separation of powers, the political merit of that design of government has not been seriously questioned. Hodges v. Public Service Commission, 110 W.Va. 649, 159 S.E. 834; Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377. That concept was invoked in the early consideration of the formulation of our federal Constitution. Reflecting the import which he attributed to the concept of separation of powers in government, James Madison, in support of the proposed Constitution, wrote: 'The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny. * * * where the Whole power of one department is exercised by the same hands which possess the Whole *114 power of another department, the fundamental principles of a free constitution are subverted.' Speaking of the judiciary, Madison, quoting Montesquieu, wrote: "Were it (judicial power) joined to the executive power, The judge might behave with all the violence of An oppressor." The Federalist Papers, Hamilton, Madison and Jay (Rossiter, 1961). Commenting on the relationship between the three recognized branches of government and the urgency of maintaining a wholly independent judiciary, Alexander Hamilton, in Essay No. 78 of The Federalist Papers, noted: 'The

executive not only dispenses the honors but holds the sword of the community. The legislature not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society, and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.'
With the real affirmative powers of government reposing in the hands of the executive and legislative branches, it becomes urgent that the judiciary department, one function of which under our fundamental law is to prevent encroachment by the other two branches, remains free and completely independent. As noted by Montesquieu in Spirit of Laws, Vol. 1, page 181: '* * * there is no liberty if the power of judging be not separated from the legislative and executive powers.' Thus, judicial independence is essential to liberty—lest the executive sword become a 'Sword of Damocles', precariously and intimidatingly suspended over the judicial head and the legislative law making power be used to usurp the rights granted by the Constitution to the people.

*Brotherton*, 157 W. Va. at 113–14, 207 S.E.2d at 430.

We have recognized that "[t]he system of 'checks and balances' provided for in American state and federal constitutions and secured to each branch of government by 'Separation of Powers' clauses theoretically and practically compels courts, when called upon, to thwart any unlawful actions of one branch of government which impair the constitutional responsibilities and functions of a coequal branch." Syl. pt. 1, *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 454 S.E.2d 65 (1994). We have also determined that "the role of this Court is vital to the preservation of the constitutional separation of powers of government where that separation, delicate under normal conditions, is jeopardized by the usurpatory actions of the executive or legislative branches of government." *State ex rel. Steele v. Kopp*, 172 W. Va. 329, 337, 305 S.E.2d 285, 293 (1983). See *State ex rel. W. Virginia Citizens Action Grp. v. W. Virginia Econ. Dev.*

34

*Grant Comm.*, 213 W. Va. 255, 264, 580 S.E.2d 869, 878 (2003) ("Underlying any encroachment of power by one branch of government is the paramount concern that such action will impermissibly foster[ ] ... dominance and expansion of power."). Moreover, this Court has never "hesitated to utilize the doctrine where we felt there was a direct and fundamental encroachment by one branch of government into the traditional powers of another branch of government." *Appalachian Power Co. v. PSC*, 170 W.Va. 757, 759, 296 S.E.2d 887, 889 (1982). See, e.g., *State ex rel. West Virginia Citizens Action Group v. West Virginia Economic Dev. Grant Comm.*, 213 W.Va. 255, 580 S.E.2d 869 (2003) (finding statute that gave legislature a role in appointing members of the West Virginia Economic Grant Committee violated Separation of Powers Clause); *State ex rel. Meadows v. Hechler*, 195 W.Va. 11, 462 S.E.2d 586 (1995) (finding statute which permitted administrative regulations to die if legislature failed to take action violated Separation of Powers Clause); *State ex rel. State Bldg. Comm'n v. Bailey*, 151 W.Va. 79, 150 S.E.2d 449 (1966) (finding statute naming legislative officers to State Building Commission violated Separation of Powers Clause).

The United States Supreme Court in *O'Donoghue v. United States*, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933) articulated the need for separating the powers of government into three distinct branches:

> The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, *Springer v. Government of Philippine Islands*, 277 U.S. 189, 201, 48 S.Ct. 480, 72 L.Ed. 845; namely, to preclude a commingling of these essentially different powers of government in the same hands....

35

If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, *but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments*. James Wilson, one of the framers of the Constitution and a justice of this court, in one of his law lectures said that the independence of each department required that its proceedings "should be free from the remotest influence, direct or indirect, of either of the other two powers." 1 Andrews, The Works of James Wilson (1896), Vol. 1, p. 367. And the importance of such independence was similarly recognized by Mr. Justice Story when he said that in reference to each other, neither of the departments "ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers." 1 Story on the Constitution, 4th ed. s 530.

*O'Donoghue*, 289 U.S. at 530–31, 53 S.Ct. at 743 (emphasis added).[25]

It must also been understood that this Court "has long recognized that it is not possible that division of power among the three branches of government be so precise and exact that there is no overlapping whatsoever." *State ex rel. Sahley v. Thompson*, 151 W.Va. 336, 341, 151 S.E.2d 870, 873 (1966), overruled in part by *State ex rel. Hill v. Smith*, 172 W. Va. 413, 305 S.E.2d 771 (1983). See *Appalachian Power Co. v. Public Serv. Comm'n of West Virginia*, 170 W. Va. 757, 759, 296 S.E.2d 887, 889 (1982) ("we have recognized the need for some flexibility in interpreting the separation of powers doctrine in order to meet the realities of modern day government[.]"). "While the Constitution contemplates the independent operation of the three fields of government as to all matters within their respective fields, there can be no doubt that the people, through

---

[25] Although federal courts recognize the separation of powers doctrine, "the federal Constitution has no specific provision analogous to [Article V, § I]." Bastress, *West Virginia State Constitution*, at 141.

36

their Constitution, may authorize one of the departments to exercise powers otherwise rightfully belonging to another department." *State ex rel. Thompson v. Morton*, 140 W.Va. 207, 223, 84 S.E.2d 791, 800–801 (1954).

With these general principles of the separation of powers doctrine guiding our analysis, we now turn to the merits of the issues presented.

**B.**

**An Administrative Rule Promulgated by the Supreme Court Supersede Statutes in Conflict with Them**

The first issue we address is the Petitioner's contention that two of the Articles of Impeachment against her are invalid, because they can only be maintained by violating the constitutional authority of the Supreme Court to promulgate rules that have the force of law and supersede any statute that conflicts with them. The two Articles of Impeachment in question are Article IV[26] and Article VI.[27] Both of those Articles charge

---

[26] The text of Article IV was set out as follows:

That the said Chief Justice Margaret Workman, and Justice Robin Davis, being at all times relevant Justices of the Supreme Court of Appeals of West Virginia, and at various relevant times individually each Chief Justice of the Supreme Court of Appeals of West Virginia unmindful of the duties of their high offices, and contrary to the oaths taken by them to support the Constitution of the State of West Virginia and faithfully discharge the duties of their offices as such Justices, while in the exercise of the functions of the office of Justices, in violation of their oaths of office, then and there, with regard to the discharge of the duties of their offices, commencing in or about 2012, did knowingly and intentionally act, and each subsequently oversee in their capacity as Chief Justice, and did in that capacity as Chief Justice severally sign and approve the contracts necessary to facilitate, at each such relevant time, to overpay certain Senior Status Judges in violation of the statutory limited maximum salary for such Judges, which overpayment is a violation of Article VIII, §7 of the West Virginia Constitution, stating that Judges "shall receive the salaries fixed by law"

the Petitioner with improperly overpaying senior-status judges. The Petitioner argues that

the statute relied upon by Article IV and Article VI is in conflict with an administrative

order promulgated by the Chief Justice.

and the provisions of W.Va. Code §51-2-13 and W.Va. Code §51-9-1 0, and, in violation of an Administrative Order of the Supreme Court of Appeals, in potential violation of 15 the provisions of W.Va. Code §61-3-22, relating to the crime of falsification of accounts with intent to enable or assist any person to obtain money to which he was not entitled, and, in potential violation of the provisions set forth in W.Va. Code §61-3-24, relating to the crime of obtaining money, property and services by false pretenses, and, all of the above are in violation of the provisions of Canon I and Canon II of the West Virginia Code of Judicial Conduct.

[27] The text of Article VI was set out as follows:

That the said Justice Margaret Workman, being at all times relevant a Justice of the Supreme Court of Appeals of West Virginia, and at certain relevant times individually Chief Justice of the Supreme Court of Appeals of West Virginia, unmindful of the duties of her high offices, and contrary to the oaths taken by her to support the Constitution of the State of West Virginia and faithfully discharge the duties of her office as such Justice, while in the exercise of the functions of the office of Justice, in violation of her oath of office, then and there, with regard to the discharge of the duties of her office, did in the year 2015, did in her capacity as Chief Justice, sign certain Forms WV 48, to retain and compensate certain Senior Status Judges the execution of which forms allowed the Supreme Court of Appeals to overpay those certain Senior Status Judges in violation of the statutorily limited maximum salary for such Judges, which overpayment is a violation of Article VIII, § 7 of the West Virginia Constitution, stating that Judges "shall receive the salaries fixed by law" and the provisions of W.Va. Code §51-2-13 and W.Va. Code §51-9-10; her authorization of such overpayments was a violation of the clear statutory law of the state of West Virginia, as set forth in those relevant Code sections, and, was an act in potential violation of the provisions set forth in W.Va. Code §61-3-22, relating to the crime of falsification of accounts with intent to enable or assist any person to obtain money to which he was not entitled, and, in potential violation of the provisions set forth in W.Va. Code §61-3-24, relating to the crime of obtaining money, property and services by false pretenses, and all of the above are in violation of the provisions of Canon I and Canon II of the West Virginia Code of Judicial Conduct.

38

We begin by observing that the 1974 Judicial Reorganization Amendment of the Constitution of West Virginia centralized the administration of the state's judicial system and placed the administrative authority of the courts in the hands of this Court.[28] See *State ex rel. Casey v. Pauley*, 158 W. Va. 298, 300, 210 S.E.2d 649, 651 (1975) ("The Judicial Reorganization Amendment was ratified by a large majority throughout the state."). The Amendment rewrote Article VIII, substituting §§ 1 to 15 for former §§ 1 to 30, amended § 13 of Article III, and added §§ 9 to 13 to Article IX. Justice Cleckley made the following observations regarding the changes:

> These changes include the entirety of the Reorganization Amendment and its concept of a unified court system administered by this Court and not the legislature. More specifically, that same amendment altered Section 1 of Article VIII to provide that the judicial power of the State "shall be vested solely " in this Court and its inferior courts. The predecessor provision to Section 1, though similarly worded, did not include the limiting adverb "solely." In addition, the Modern Budget Amendment insulated the judiciary from political retaliation by preventing the governor and legislature from reducing the judiciary's budget submissions. W.Va. Const., art. V, § 51; *State ex rel. Bagley v. Blankenship*, 161 W.Va. 630, 246 S.E.2d 99 (1978); *State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 207 S.E.2d 421 (1973). Taken together, these amendments create a strong and independent judiciary that can concentrate on delivering a high quality, fair, and efficient system of justice to the citizens of West Virginia. Such measures are particularly useful in a State such as ours that continues, and appropriately so, to elect judges to fixed terms of office. That is, because judges remain ultimately beholden to the electorate, the need is even greater to insulate the judiciary from the more routine politics of the annual budget process and legislative or executive manipulation.
> ***
> [A]ltering the administrative structure did not negate all prior laws that are tangentially related to administrative matters. To the contrary, the Reorganization Amendment provides us with a hierarchy to be used in resolving administrative conflicts and problems. As we explained in

---

[28] "The Judicial Reorganization Amendment was ratified on November 5, 1974." *State ex rel. Dunbar v. Stone*, 159 W. Va. 331, 333, 221 S.E.2d 791, 792 (1976).

>*Rutledge*, this Court's "exclusive authority over the administration, and primary responsibility for establishing rules of practice and procedure, secures businesslike management for the courts and promotes simplified and more economical judicial procedures." 175 W.Va. at 379, 332 S.E.2d at 834. Under the Amendment, the Judiciary, not the executive branch, is vested with the authority to resolve any substantial, genuine, and irreconcilable administrative conflicts regarding court personnel. The judicial system was revised, among other things, to simplify the administrative process and to complement prior nonconflicting statutory and case law. Clearly, the administrative structure requires that if there is a conflict, we must not only consider the concerns of the parties, but also look at the hierarchy of the court system. The administration of the court is very important to the unobstructed flow of court proceedings and business. Court actions are complicated enough without adding to their complexity a struggle over every administrative decision to be made. The purpose of judicial administrative authority is to enhance and simplify our court system and not to burden it.

*State ex rel. Frazier v. Meadows*, 193 W. Va. 20, 26-28, 454 S.E.2d 65, 71-73 (1994).

Professor Bastress has compared the general authority of the Supreme Court before and after the Reorganization Amendment as follows:

>The third and fourth paragraphs, added by the Judicial Reorganization Amendment of 1974, establish the unitary judicial system in West Virginia. The first of those grants the court the power to promulgate rules of procedure relating to all aspects of judicial proceedings in the state. Although the court had previously asserted that as an inherent power, it also conceded that the legislature retained the ultimate authority. After the 1974 amendment, however, the court has ruled, in justifiable reliance on the language of section 3, that the court's rules supersede any legislation in conflict with a court-promulgated rule.

Bastress, *West Virginia State Constitution*, at 227. See *Foster v. Sakhai*, 210 W. Va. 716, 724 n.3, 559 S.E.2d 53, 61 n.3 (2001) ("the constitutional power and inherent power of the judiciary prevent another branch of government from usurping the Court's authority.").

One of the most important changes that the Reorganization Amendment made was to provide this Court with the exclusive constitutional authority to promulgate administrative rules for the effective management of the judicial system, that "have the force and effect of statutory law and operate to supersede any law that is in conflict with them." Syl. pt. 1, in part, *Stern Brothers, Inc. v. McClure*, 160 W.Va. 567, 236 S.E.2d 222 (1977). This authority is found in Article VIII, § 3 of the Constitution of West Virginia. We will address the relevant text of both provisions separately.[29]

To begin, we will look at the Rule-Making Clause of Section 3. The relevant text of the Rule-Making Clause of Section 3 provides as follows:

> The court shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the state relating to writs, warrants, process, practice and procedure, which shall have the force and effect of law.

Section 3 unquestionably provides this Court with the sole constitutional authority to promulgate rules for the judicial system, and demands that those rules have the force of law. See Syl. pt. 5, *State v. Wallace*, 205 W. Va. 155, 517 S.E.2d 20 (1999) ("The West Virginia Rules of Criminal Procedure are the paramount authority controlling criminal proceedings before the circuit courts of this jurisdiction; any statutory or common-law procedural rule that conflicts with these Rules is presumptively without force or effect."); Syl. pt. 10, *Teter v. Old Colony Co.*, 190 W. Va. 711, 714, 441 S.E.2d 728, 731 (1994) "Under Article VIII, ... Section 3 of the Constitution of West Virginia (commonly known as the Judicial Reorganization Amendment), administrative rules promulgated by the

---

[29] The authority of the Court to promulgate rules is also contained in Article VIII, § 8. This provision is discussed in the next section of this opinion.

41

Supreme Court of Appeals of West Virginia have the force and effect of statutory law and operate to supersede any law that is in conflict with them."); Syl. pt. 1, *Bennett v. Warner*, 179 W. Va. 742, 372 S.E.2d 920 (1988), superseded by statute as stated in *Miller v. Allman*, 240 W. Va. 438, 813 S.E.2d 91 (2018) ("Under article eight, section three of our Constitution, the Supreme Court of Appeals shall have the power to promulgate rules for all of the courts of the State related to process, practice, and procedure, which shall have the force and effect of law.").

The responsibility imposed on this Court by Section 3 was articulated in *State ex rel. Bagley v. Blankenship*, 161 W.Va. 630, 246 S.E.2d 99 (1978):

> The Judicial Reorganization Amendment, Article VIII, Section 3, of the Constitution, placed heavy responsibilities on this Court for administration of the state's entire court system. The mandate of the people, so expressed, commands the members of the Court to be alert to the needs and requirements of the court system throughout the state.

*Bagley*, 161 W.Va. at 644–45, 246 S.E.2d at 107. "Not only does our Constitution explicitly vest the judiciary with the control over its own administrative business, but it is a fortiori that the judiciary must have such control in order to maintain its independence." Syl. pt. 2, *State ex rel. Lambert v. Stephens*, 200 W.Va. 802, 490 S.E.2d 891 (1997).

In carrying out the responsibility imposed by Section 3, this Court has not been hesitant in finding statutes void when they were in conflict with any rule promulgated by this Court. See Syl. pt. 1, *Witten v. Butcher*, 238 W. Va. 323, 794 S.E.2d 587 (2016) ("The provision in W. Va. Code § 3-7-3 (1963) requiring oral argument to be held in an appeal of a contested election, is invalid because it is in conflict with the oral argument criteria of Rule 18 of the West Virginia Rules of Appellate Procedure."); Syl. pt. 6, *State*

42

*Farm Fire & Cas. Co. v. Prinz*, 231 W. Va. 96, 743 S.E.2d 907 (2013) ("Because it addresses evidentiary matters that are reserved to and regulated by this Court pursuant to the Rule–Making Clause, Article VIII, § 3 of the West Virginia Constitution, West Virginia Code § 57–3–1 (1937), commonly referred to as the Dead Man's Statute, is invalid, as it conflicts with the paramount authority of the West Virginia Rules of Evidence."); Syl. pt. 3, *Louk v. Cormier*, 218 W. Va. 81, 622 S.E.2d 788 (2005) ("The provisions contained in W. Va. Code § 55–7B–6d (2001) were enacted in violation of the Separation of Powers Clause, Article V, § 1 of the West Virginia Constitution, insofar as the statute addresses procedural litigation matters that are regulated exclusively by this Court pursuant to the Rule–Making Clause, Article VIII, § 3 of the West Virginia Constitution. Consequently, W. Va. Code § 55–7B–6d, in its entirety, is unconstitutional and unenforceable."); *Games-Neely ex rel. W. Virginia State Police v. Real Property*, 211 W. Va. 236, 245, 565 S.E.2d 358, 367 (2002) ("Rule 60(b) has the force and effect of law; applies to forfeiture proceedings under the Forfeiture Act; and supersedes West Virginia Code § 60A–7–705(d) to the extent that Section 705(d) can be read to deprive a circuit court of its grant of discretion to review a default judgment order."); *Oak Cas. Ins. Co. v. Lechliter*, 206 W. Va. 349, 351 n.3, 524 S.E.2d 704, 706 n.3 (1999) ("We note, however, that to any extent that W. Va. Code § 56–10–1 may be in conflict with W. Va. R. Civ. P. Rule 22, it has been superseded."); *W. Virginia Div. of Highways v. Butler*, 205 W. Va. 146, 150, 516 S.E.2d 769, 773 (1999) ("if W.Va. Code § 37–14–1 et seq., unambiguously prohibited anyone but a licensed or certified appraiser from testifying with regard to the value of real estate in a court proceeding, this prohibition would be

contrary to the Rules of Evidence promulgated by this Court, pursuant to article eight, section three of our Constitution, and, thus, the prohibition would be void."); *State v. Jenkins*, 195 W. Va. 620, 625 n.5, 466 S.E.2d 471, 476 n.5 (1995) (finding W.Va. R. Evid. Rule 901 superseded W.Va. Code § 57-2-1); Syl. pt. 2, *Williams v. Cummings*, 191 W. Va. 370, 445 S.E.2d 757 (1994) ("West Virginia Code § 56-1-1(a)(7) provides that venue may be obtained in an adjoining county '[i]f a judge of a circuit be interested in a case which, but for such interest, would be proper for the jurisdiction of his court....' This statute refers to a situation under which a judge might be disqualified, and therefore it is in conflict with and superseded by Trial Court Rule XVII, which addresses the disqualification and temporary assignment of judges."); *Mayhorn v. Logan Med. Found.*, 193 W. Va. 42, 454 S.E.2d 87 (1994) (finding W.Va. Code, 55-7B-7, which outlined the qualifications of an expert in a medical malpractice case, was superseded by W.Va. R. Evid. 702); *Teter v. Old Colony Co.*, 190 W. Va. 711, 726, 441 S.E.2d 728, 743 (1994) ("a legislative enactment which is substantially contrary to provisions in our Rules of Evidence would be invalid."); Syl. pt. 2, *State ex rel. Gains v. Bradley*, 199 W. Va. 412, 484 S.E.2d 921 (1997) ("Rule 1B of the Administrative Rules for Magistrate Courts supersedes W.Va. Code § 50-4-7 (1992), and prospectively provides there is no automatic mandatory right of a party to have a magistrate disqualified."); *Gilman v. Choi*, 185 W. Va. 177, 178, 406 S.E.2d 200, 201 (1990), overruled on other grounds by *Mayhorn v. Logan Med. Found.*, 193 W. Va. 42, 454 S.E.2d 87 (1994) ("W.Va. Code, 55–7B–7 [1986], being concerned primarily with the competency of expert testimony in a medical malpractice action, is valid under Rule 601 of the West Virginia Rules of

Evidence."); Syl. pt. 2, *State v. Davis*, 178 W. Va. 87, 88, 357 S.E.2d 769, 770 (1987), overruled on other grounds *State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994) ("Rule 7(c)(1) of the West Virginia Rules of Criminal Procedure supersedes the provisions of W.Va. Code, 62-9-1, to the extent that the indorsement of the grand jury foreman and attestation of the prosecutor are no longer required to be placed on the reverse side of the indictment. Such indorsement and attestation are sufficient if they appear on the face of the indictment."); *Hechler v. Casey*, 175 W.Va. 434, 333 S.E.2d 799 (1985) (invalidating a statute in part that was in conflict with W. Va. R.App. P., Rule 23); *State ex rel. Quelch v. Daugherty*, 172 W. Va. 422, 425, 306 S.E.2d 233, 236 (1983) ("W.Va. Code, 30-2-1, as amended, is an unconstitutional usurpation of this Court's exclusive authority to regulate admission to the practice of law in this State."); Syl. pt. 2, in part, *Carey v. Dostert*, 170 W. Va. 334, 294 S.E.2d 137 (1982) "(West Virginia Code, 30-2-7 and a circuit court's common-law power to disbar are obsolete and have been superseded by ... the Judicial Reorganization Amendment of our Constitution, Article VIII."); *State ex rel. Askin v. Dostert*, 170 W. Va. 562, 567, 295 S.E.2d 271, 276 (1982) (holding that to the extent W.Va. Code § 30-2-1 required security from attorneys to insure their good behavior, it "conflicts with the rules promulgated by this Court [and] must fall.").

Before we address the issue of overpayment of senior-status judges, we must examine the text of the Senior-Status Clause found in Article VIII, § 8 of the Constitution of West Virginia provides as follows:

A retired justice or judge may, with his permission and with the approval of the supreme court of appeals, be recalled by the chief justice of the supreme court of appeals for temporary assignment as a justice of the supreme court of appeals, or judge of an intermediate appellate court, a circuit court or a magistrate court.

The issue of the authority of the Chief Justice to appoint judges for temporary service has been addressed in two cases by this Court. First, in *State ex rel. Crabtree v. Hash*, 180 W. Va. 425, 376 S.E.2d 631 (1988) the judge for the Fifth Judicial Circuit (consisting of Calhoun, Jackson and Roane counties) retired from office. A special judge was elected and appointed to fill the vacancy by several members of the Jackson County Bar Association, pursuant to W.Va. Code § 51-2-10.[30] The Administrative Director of this Court filed a writ of prohibition to prevent the newly appointed judge from holding office. The opinion succinctly held that the statute was void as follows:

W.Va. Const. art. VIII, §§ 3 and 8, and all administrative rules made pursuant to the powers derived from article VIII, supersede W.Va. Code, 51-2-10 [1931] and vest the Chief Justice of the Supreme Court of Appeals with the sole power to appoint a judge for temporary service in any situation which requires such an appointment.
\*\*\*
Any election conducted pursuant to W.Va. Code, 51-2-10 [1931] is void as the constitutional power to assign judges for temporary service rests with the Chief Justice of the West Virginia Supreme Court of Appeals.

*Crabtree*, 180 W. Va. at 428, 376 S.E.2d at 634. In a footnote in *Crabtree* this Court made further observations relevant to this proceeding:

W.Va. Const. art. VIII, governing the judiciary, has only been amended twice in the State's history, in 1880 and 1974. Prior to 1974, the Supreme Court of Appeals had no constitutionally derived administrative authority over the lower tribunals of the State. Instead, the legislature had substantial authority, including the power to create laws concerning special judges.

[30] This statute was subsequently repealed.

W.Va. Const. art. VIII, § 15 (repealed) stated: "The legislature shall provide by law for holding regular and special terms of the circuit courts, where from any cause the judge shall fail to attend, or, if in attendance, cannot properly preside."

The upshot of this authority was W.Va. Code, 51-2-10 [1931]. By virtue of former art. VIII, § 15, this Court had no constitutional authority to act in such matters.

However, as a result of the Judicial Reorganization Amendment of 1974, the legislature was divested of all administrative powers over state court judges. No provision similar to former art. VIII, § 15 exists. Instead, this Court was given "general supervisory control over all intermediate appellate courts, circuit courts and magistrate courts," and the Chief Justice, as "administrative head of all the courts," was specifically given the power of temporary assignment of circuit judges.

*Crabtree*, 180 W. Va. at 427 n.3, 376 S.E.2d at 633 n.3 (internal citations omitted).

The decision in *Stern Bros. v. McClure*, 160 W. Va. 567, 236 S.E.2d 222 (1977) addressed the issue of statutes that attempted to control assignments of judges, but were in conflict with an administrative rule of this Court. In *Stern* the defendants filed a writ of prohibition with this Court to have a substitute trial judge removed from their case. The trial judge was appointed by the Chief Justice of this Court because the original judge was disqualified. The defendants argued that the manner in which the substitute judge was appointed was inconsistent with the statutory scheme for appointing a substitute judge when the original judge is disqualified. This Court found that the administrative rule adopted by this Court for the appointment of a substitute judge invalidated the statutes. The opinion reasoned as follows:

Procedures for appointment of a substitute judge were promulgated by this Court on May 29, 1975, in an administrative rule dealing with the temporary assignment of circuit court judges where a particular judge is disqualified from handling a case….

The power to promulgate administrative rules is expressly conferred upon this Court under the Judicial Reorganization Amendment, and under

47

Section 8 explicit recognition is made of the inherent rulemaking power of the Court, which prior to the Judicial Reorganization Amendment had been utilized by this Court to adopt judicial rules.

Such rules have the force and effect of statutory law by virtue of Article VIII, Section 8 of the Judicial Reorganization Amendment…. Prior to the adoption of the Judicial Reorganization Amendment, there may have been some question as to this Court's supervisory powers over lower courts. It is now quite clear under the Judicial Reorganization Amendment that considerable supervisory powers have been conferred upon this Court. There was also some confusion prior to the Judicial Reorganization Amendment as to what further action a disqualified judge could take in the case. This arose partly out of the fact that there was no clear authority in the Supreme Court to temporarily assign judges in such situations. Consequently, the disqualified judge had either to initiate the election of a special judge pursuant to W.Va. Code, 51-2-10, or to attempt to transfer the case to another circuit court in accordance with W.Va. Code, 56-9-2.

The statute relating to disqualification of judges contained a proviso permitting the judge ". . . to enter a formal order designed merely to advance the cause towards a final hearing and not requiring judicial action involving the merits of the case." W.Va. Code, 51-2-8….

Undoubtedly, one of the reasons behind the Judicial Reorganization Amendment was to provide a more simplified system of handling the problem of securing a replacement judge where the original judge is disqualified. The former procedures were cumbersome at best. Special judge elections were constantly attacked and in many instances overturned because of some technical failure to follow W.Va. Code, 51-2-10.

The administrative rule promulgated by this Court now controls the procedure for selection of a temporary judge where a disqualification exists as to a circuit court judge. Under Article VIII, Section 8 of the West Virginia Constitution, it operates to supersede the existing statutory provisions found in W.Va. Code, 51-2-9 and -10, and W.Va. Code, 56-9-2, insofar as they relate to the selection of special judges or the assignment of the case to another circuit judge when a circuit judge is disqualified.

*Stern*, 160 W. Va. at 572-575, 236 S.E.2d at 225-227.[31]

---

[31] It will be noted that the Legislature repealed W.Va. Code §§ 51-2-9 and 10 in 1992. Although W.Va. Code § 56-9-2 , which was enacted in 1868 and last amended 1923, was invalidated by *Stern* the Legislature has not repealed it.

In the final analysis, the foregoing discussion instructs this Court that statutory laws that are repugnant to the constitutionally promulgated rules of this Court are void. With these legal principles in full view, we turn to the merits of the issue presented.

Two of the Articles of Impeachment brought against the Petitioner, Article IV and Article VI, charge her with overpaying senior-status judges in violation of the maximum payment allowed under W.Va. Code § 51-9-10. The Articles of Impeachment also state that the overpayments violated W.Va. Code § 51-2-13, W.Va. Const. Art. VIII, § 7, an administrative order of the Supreme Court and Canon I and II of the West Virginia Code of Judicial Conduct. The Articles also allege that the overpayments "potentially" violate two criminal statutes: W.Va. Code § 61-3-22 (falsification of accounts) and W.Va. Code § 61-3-24 (obtaining money by false pretenses).[32] The viability of all of the alleged violations in the two Articles hinge upon whether the Petitioner overpaid senior-status judges. The determination of overpayment is controlled by W.Va. Code § 51-9-10, which limits the payment to senior-status judges. The full text of W.Va. Code § 51-9-10 provides as follows:

> The West Virginia supreme court of appeals is authorized and empowered to create a panel of senior judges to utilize the talent and experience of former circuit court judges and supreme court justices of this state. The supreme court of appeals shall promulgate rules providing for said judges and justices to be assigned duties as needed and as feasible toward the objective of reducing caseloads and providing speedier trials to litigants throughout the state: Provided, That reasonable payment shall be made to said judges and justices on a per diem basis: Provided, however, That *the*

---

[32] We must note that "potentially" violating a criminal statute is not wrongful impeachable conduct. Therefore the language in the Articles of Impeachment that state that W.Va. Code § 61-3-22 and W.Va. Code § 61-3-24 were "potentially" violated are meaningless allegations.

*per diem and retirement compensation of a senior judge shall not exceed the salary of a sitting judge*, and allowances shall also be made for necessary expenses as provided for special judges under articles two and nine of this chapter.[33] (Emphasis added.)

The Petitioner does not dispute that she authorized the payment of senior-status judges, when necessary, in excess of the limitation imposed by the statute. Although the Petitioner has advanced several arguments as to why her conduct was valid, we need only address one of her arguments. That argument centers on an administrative order promulgated by the Chief Justice on May 17, 2017.[34] The order expressly authorized the payment of senior-status judges in excess of the limitation imposed by W.Va. Code § 51-9-10. The order stated that it was being promulgated under the authority of Article III, §§ 3, 8, and 17. The order also stated the reason for the decision to authorize payment in excess of the statutory limitation:

> In the vast majority of instances, the statutory proviso [W.Va. Code § 51-9-10] does not interfere with providing essential services. However, in certain exigent circumstances involving protracted illness, lengthy suspensions due to ethical violations, or other extraordinary circumstances, it is impossible to assure statewide continuity of judicial services without exceeding the payment limitation imposed by the statutory proviso.

The Petitioner provided an illustration of a situation where it was necessary to pay a senior-status judge in excess of the statutory limitation:

> For example, in 2017, the Supreme Court of Appeals suspended a newly elected circuit court judge of Nicholas County for two years because of violations of the code of judicial ethics in certain campaign advertisements. *In re Callaghan*, 238 W.Va. 495, 503, 796 S.E.2d 604, 612, cert. denied sub. nom., *Callaghan v. W. Virginia Judicial Investigation Comm'n*, 138

---

[33] This statute was originally enacted in 1949 and was amended in 1975 and 1991.

[34] The Chief Justice at that time was Justice Loughry.

S.Ct. 211, 199 L.Ed.2d 118 (2017). Because the newly elected Judge was suspended for two years, and because Nicholas County is a single judge judicial circuit, an extraordinary need for temporary judicial services arose in order to provide the people of Nicholas County with court services and to avoid the unconstitutional denial of access to the speedy administration of justice. The Chief Justice appointed senior status Judge James J. Rowe to serve as the temporary circuit judge of Nicholas County. Judge Rowe travels from his home in Lewisburg each day to perform this service. Judge Rowe serves the people of Nicholas County effectively, attending to the cases on the circuit court's docket. Using one senior status judge, rather than parading multiple judges through the courthouse, allows for the efficient and consistent adjudication of the matters pending in Nicholas County.

Prior to the Reorganization Amendment, "the Supreme Court of Appeals had no constitutionally derived administrative authority over the lower tribunals of the State. Instead, the Legislature had substantial authority, including the power to create laws concerning special judges." *State ex rel. Crabtree v. Hash*, 180 W. Va. 425, 427, 376 S.E.2d 631, 633 (1988). This authority is evident in W.Va. Code § 51-9-10 which, as noted, was enacted in 1949. We have observed as a general matter that "[t]he 1974 Judicial Reorganization Amendment to our State Constitution also recognized that previously enacted laws repugnant to it were voided." *Carey v. Dostert*, 170 W. Va. 334, 336, 294 S.E.2d 137, 139 (1982). See W.Va. Const. Art. VIII, § 13 ("Except as otherwise provided in this article, such parts of the common law, and of the laws of this state as are in force on the effective date of this article *and are not repugnant thereto*, shall be and continue the law of this state until altered or repealed by the Legislature.") (emphasis added). West Virginia Code § 51-9-10, in its entirety, is repugnant to Article VIII, § 3 and § 8. The statute seeks to control a function of the judicial system, appointing senior-status judges for temporary service, when Article VIII, § 8 has expressly given that

function exclusively to the Supreme Court. Moreover, the statute's limitation on payment to senior-status judges is void and unenforceable, because of the administrative order promulgated on May 17, 2017.[35] See Syl. pt. 4, *State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 207 S.E.2d 421 (1973) ("The judiciary department has the inherent power to determine what funds are necessary for its efficient and effective operation."). Finally, as we have long held, "[l]egislative enactments which are not compatible with those prescribed by the judiciary or with its goals are unconstitutional violations of the separation of powers." *State ex rel. Quelch v. Daugherty*, 172 W. Va. 422, 424, 306 S.E.2d 233, 235 (1983). To be clear, and we so hold, West Virginia Code § 51-9-10 (1991) violates the Separation of Powers Clause of Article V, § 1 of the West Virginia Constitution, insofar as that statute seeks to regulate judicial appointment matters that are regulated exclusively by this Court pursuant to Article VIII, § 3 and § 8 of the West Virginia Constitution. Consequently, W.Va. Code § 51-9-10, in its entirety, is unconstitutional and unenforceable.[36]

---

[35] It is not relevant that the administrative order was entered several years after the Petitioner's authorized payments. The statute was void at the time in which the Respondents sought to impeach her.

[36] We summarily dispense with the Articles of Impeachment's reference to the Salary Clause of Article VIII, § 7 as a source of legislative authority for regulating payments to senior-status judges. This clause does not provide such authority. The Salary Clause provides as follows:

> Justices, judges and magistrates shall receive the salaries fixed by law, which shall be paid entirely out of the state treasury, and which may be increased but shall not be diminished during their term of office, and they shall receive expenses as provided by law. The salary of a circuit judge shall also not be diminished during his term of office by virtue of the

52

In light of our holding, the Petitioner did not overpay any senior-status judge as alleged in Article IV and Article VI of the Articles of Impeachment, therefore the Respondents are prohibited from further prosecution of the Petitioner under those Articles.

## C.

### The Supreme Court has Exclusive Jurisdiction to Determine whether a Judicial Officer's Conduct Violates a Canon of the Code of Judicial Conduct

The Petitioner next contends that Article XIV of the Impeachment Articles is invalid because it is based upon alleged violations of the West Virginia Code of Judicial Conduct, which, she contends, is constitutionally regulated by the Supreme Court.[37] To

---

statutory courts of record of limited jurisdiction of his circuit becoming a part of such circuit as provided in section five of this article.

It is clear from the plain text of the Salary Clause that it only applies to salaries of judges "during their term of office." See Syl. pt. 1, *State ex rel. Trent v. Sims*, 138 W.Va. 244, 77 S.E.2d 122 (1953) ("If a constitutional provision is clear in its terms, and the intention of the electorate is clearly embraced in the language of the provision itself, this Court must apply and not interpret the provision."). Senior-status judges are retired judges and do not hold an office. Therefore, the Salary Clause does not provide the Legislature with authority to regulate the per diem payment of senior-status judges.

[37] The text of Article XIV was set out as follows:

That the said Chief Justice Margaret Workman, Justice Allen Loughry, Justice Robin Davis, and Justice Elizabeth Walker, being at all times relevant Justices of the Supreme Court of Appeals of West Virginia, unmindful of the duties of their high offices, and contrary to the oaths taken by them to support the Constitution of the State of West Virginia and faithfully discharge the duties of their offices as such Justices, while in the exercise of the functions of the office of Justices, in violation of their oaths of office, then and there, with regard to the discharge of the duties of their offices, did, in the absence of any policy to prevent or control expenditure, waste state funds with little or no concern for the costs to be borne by the tax payers for unnecessary and lavish spending for various purposes including, but without limitation, to certain examples, such as: to remodel

53

state offices, for large increases in travel budgets-including unaccountable personal use of state vehicles, for unneeded computers for home use, for regular lunches from restaurants, and for framing of personal items and other such wasteful expenditure not necessary for the administration of justice and the execution of the duties of the Court; and, did fail to provide or prepare reasonable and proper supervisory oversight of the operations of the Court and the subordinate courts by failing to carry out one or more of the following necessary and proper administrative activities:

A) To prepare and adopt sufficient and effective travel policies prior to October of 2016, and failed thereafter to properly effectuate such policy by excepting the Justices from said policies, and subjected subordinates and employees to a greater burden than the Justices;

B) To report taxable fringe benefits, such as car use and regular lunches, on Federal W-2s, despite full knowledge of the Internal Revenue Service Regulations, and further subjected subordinates and employees to a greater burden than the Justices, in this regard, and upon notification of such violation, failed to speedily comply with requests to make such reporting consistent with applicable law;

C) To provide proper supervision, control, and auditing of the use of state purchasing cards leading to multiple violations of state statutes and policies regulating the proper use of such cards, including failing to obtain proper prior approval for large purchases;

D) To prepare and adopt sufficient and effective home office policies which would govern the Justices' home computer use, and which led to a lack of oversight which encouraged the conversion of property;

E) To provide effective supervision and control over record keeping with respect to the use of state automobiles, which has already resulted in an executed information upon one former Justice and the indictment of another Justice.

F) To provide effective supervision and control over inventories of state property owned by the Court and subordinate courts, which led directly to the undetected absence of valuable state property, including, but not limited to, a state-owned desk and a state owned computer;

54

be blunt, Article XIV is an unwieldy compilation of allegations that culminate with the accusation that the Petitioner's conduct, with respect to the allegations, violated Canon I[38] and Canon II[39] of the Code of Judicial Conduct.[40] We agree with the Petitioner that this Court has exclusive constitutional jurisdiction over conduct alleged to be in violation of the Code of Judicial Conduct.

The controlling constitutional authority is set out under Article VIII, § 8 of the Constitution of West Virginia. We have held that "[p]ursuant to article VIII, section 8 of the West Virginia Constitution, this Court has the inherent and express authority to 'prescribe, adopt, promulgate and amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and

---

> G) To provide effective supervision and control over purchasing procedures which directly led to inadequate cost containment methods, including the rebidding of the purchases of goods and services utilizing a system of large unsupervised change orders, all of which encouraged waste of taxpayer funds.

> The failure by the Justices, individually and collectively, to carry out these necessary and proper administrative activities constitute a violation of the provisions of Canon I and Canon II of the West Virginia Code of Judicial Conduct.

[38] Canon I states the following:

> A judge shall uphold and promote the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

[39] Canon II states the following:

> A judge shall perform the duties of judicial office impartially, competently, and diligently.

[40] We will note that Article IV and Article VI of the Articles of Impeachment also contained allegations that Canon I and Canon II were violated.

magistrates, along with sanctions and penalties for any violation thereof [.]'" Syl. pt. 5,

*Committee on Legal Ethics v. Karl*, 192 W.Va. 23, 449 S.E.2d 277 (1994). The relevant

text of Section 8 provides as follows:

> Under its inherent rule-making power, which is hereby declared, the
> supreme court of appeals shall, from time to time, prescribe, adopt,
> promulgate and amend rules prescribing a judicial code of ethics, and a
> code of regulations and standards of conduct and performances for justices,
> judges and magistrates, along with sanctions and penalties for any violation
> thereof, and the supreme court of appeals is authorized to censure or
> temporarily suspend any justice, judge or magistrate having the judicial
> power of the state, including one of its own members, for any violation of
> any such code of ethics, code of regulations and standards, or to retire any
> such justice, judge or magistrate who is eligible for retirement under the
> West Virginia judges' retirement system (or any successor or substituted
> retirement system for justices, judges and magistrates of this state) and
> who, because of advancing years and attendant physical or mental
> incapacity, should not, in the opinion of the supreme court of appeals,
> continue to serve as a justice, judge or magistrate.
> ***
> When rules herein authorized are prescribed, adopted and promulgated,
> they shall supersede all laws and parts of laws in conflict therewith, and
> such laws shall be and become of no further force or effect to the extent of
> such conflict.

This Court's express constitutional authority to adopt rules of judicial conduct and

discipline is obvious from the language of Section 8. Pursuant to this express authority,

we have adopted the Code of Judicial Conduct and the Rules of Judicial Disciplinary

Procedure. Under Rule 4.10 and Rule 4.11 of the Rules of Judicial Disciplinary

Procedure, this Court has the exclusive authority to determine whether a justice, judge, or

magistrate violated the Code of Judicial Conduct. The record does not disclose that this

Court has found that the Petitioner violated Canon I or Canon II, based upon the

allegations alleged in Article XIV of the Articles of Impeachment. Moreover, even if the

record had disclosed that  the Petitioner was previously found to have violated the

Canons in question, those violations could not have formed the basis of an  impeachment

charge. This is because of the limitations imposed upon the scope of a Canon violation

that is found by this Court. The following is provided in Item 7 of the Scope of the Code

of Judicial Conduct:

> The Code is not designed or intended as a basis for civil or criminal
> liability. Neither is it intended to be the basis for litigants to seek collateral
> remedies against each other or to obtain tactical advantages in proceedings
> before a court.

It is quite clear that Item 7 prohibits a Canon violation from being used as the "basis" of a

civil or criminal charge and, thus, could not be used as a basis for impeaching the

Petitioner.[41]  This Court observed in *In re Watkins*, 233 W. Va. 170, 757 S.E.2d 594

(2013):

> Just as the legislative branch has the power to examine the qualifications of
> its own members and to discipline them, this Court has the implicit power
> to discipline members of the judicial branch. The Court has this power
> because it is solely responsible for the protection of the judicial branch, and
> because the power has not been constitutionally granted to either of the
> other two branches.

*Watkins*, 233 W. Va. at 177, 757 S.E.2d at 601.

It is quite evident to this Court that the impeachment proceedings under Article

XIV of the Articles of Impeachment requires the Court of Impeachment to make a

---

[41] It has long been recognized that an impeachment proceeding is civil in nature. See *Skeen v. Craig*, 31 Utah 20, 86 P. 487, 487-488 (1906) ("The question as to whether [impeachment] proceedings of this kind to remove from office a public official are civil or criminal has been before the courts of other states, and, while the decisions are not harmonious, yet the great weight of authority, and as we think the better reasoned cases hold that such actions are civil.").

determination that the Petitioner violated Canon I and Canon II. Such a determination in that forum violates the separation of powers doctrine, because pursuant to Article VIII, § 8 of the Constitution of West Virginia, this Court has the exclusive authority to determine whether the Petitioner violated either of those Canons. In other words, and we so hold, this Court has exclusive authority and jurisdiction under Article VIII, § 8 of the West Virginia Constitution and the rules promulgated thereunder, to sanction a judicial officer for a violation of a Canon of the West Virginia Code of Judicial Conduct. Therefore, the Separation of Powers Clause of Article V, § 1 of the West Virginia Constitution prohibits the Court of Impeachment from prosecuting a judicial officer for an alleged violation of the Code of Judicial Conduct.

The Respondents have argued that "to hold that the Legislature cannot consider the Code of Judicial Conduct in its deliberation of impeachment proceedings against a judicial officer would have the absurd result of prohibiting removal from office for any violations of the Code of Judicial Conduct." This argument misses the point. Unquestionably, the Legislature can consider in its deliberations whether there was evidence showing that this Court found a judicial officer violated a Canon. However, the Canon violation itself cannot be the basis of the impeachment charge--at most it could only act as further evidence for removal based upon other valid charges of wrongful conduct.

In light of our holding, the Court of Impeachment does not have jurisdiction over the alleged violations set out in Article XIV of the Articles of Impeachment, therefore the

Respondents are prohibited from further prosecution of the Petitioner under that Article as written.[42]

## D.

### The Articles of Impeachment were Filed in Violation of Provisions of House Resolution 201

Although we have determined that the Petitioner is entitled to relief based upon the foregoing, we believe that the remaining issues involving the failure to comply with two provisions of House Resolution 201 are not moot. This Court set forth a three-prong test to determine whether we should rule on the merits of technically moot issues in syllabus point 1 of *Israel by Israel v. West Virginia Secondary Schools Activities Commission*, 182 W.Va. 454, 388 S.E.2d 480 (1989):

> Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

---

[42] We must also note that even if Article XIV of the Articles of Impeachment had set out a valid basis for impeachment, it would still not pass constitutional muster on due process grounds, because it is vague and ambiguous. See *State v. Bull*, 204 W. Va. 255, 261, 512 S.E.2d 177, 183 (1998) ("Claims of unconstitutional vagueness in [charging instruments] are grounded in the constitutional due process clauses, U.S. Const. amend. XIV, Sec. 1, and W.Va. Const. art. III, Sec. 10."). As drafted, the Article failed to specify which Justice committed any of the myriad of conduct allegations. The Petitioner had a constitutional right to be "adequately informed of the nature of the charge[.]" *State v. Hall*, 172 W. Va. 138, 144, 304 S.E.2d 43, 48 (1983). See Single Syllabus, *Myers v. Nichols*, 98 W. Va. 37, 126 S.E. 351 (1925) ("While charges for the removal of a public officer need not be set out in the strict form of an indictment, they should be sufficiently explicit to give the defendant notice of what he is required to answer.").

We believe that there may be collateral consequences in failing to address the issues, the issues are of great public importance, and the issues may present themselves again. *State ex rel. McKenzie v. Smith*, 212 W. Va. 288, 297, 569 S.E.2d 809, 818 (2002) ("Because of the possibility that the Division's continued utilization of this system may escape review at the appellate level, we address the merits of this case under the ... exception to the mootness doctrine.").

The Petitioner has argued that House Resolution 201 required the House Committee on the Judiciary to set out findings of fact in the Articles of Impeachment and required the House of Delegates adopt a resolution of impeachment. The Petitioner contends that neither of these required tasks were performed and that her right to due process was violated as a consequence. We agree.

We begin by noting that "[t]he threshold question in any inquiry into a claim that an individual has been denied procedural due process is whether the interest asserted by the individual rises to the level of a 'property' or 'liberty' interest protected by Article III, Section 10 of our constitution." *Clarke v. West Virginia Board of Regents*, 166 W.Va. 702, 709, 279 S.E.2d 169, 175 (1981).[43] See Syl. Pt. 1, *Waite v. Civ. Serv. Comm'n*, 161 W.Va. 154, 241 S.E.2d 164 (1977), overruled on other grounds *West Virginia Dep't of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017) ("The Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards

---

[43] Article III, § 10 of the Constitution of West Virginia provides as follows:

No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers.

60

against state action which affects a liberty or property interest."). We have held as a general matter that "[a]n administrative body must abide by the remedies and procedures it properly establishes to conduct its affairs." *State ex rel. Wilson v. Truby*, 167 W. Va. 179, 188, 281 S.E.2d 231, 236 (1981). The Petitioner has both a liberty[44] and property[45] interest in having the impeachment rules followed. The Petitioner has a liberty interest in not having her reputation destroyed in the legal community and public at-large by being impeached and removed from office; and she has a property interest in obtaining her pension when she chooses to retire.

We begin by noting the record supports the Petitioner's contention that House Resolution 201 required the Judiciary Committee to set out findings of fact, and that this was not done. Rule 3 and 4 of Resolution 201 required the Judiciary Committee to do the following:

3. To make findings of fact based upon such investigation and hearing(s);

---

[44] See Syl. pt. 2, *Waite v. Civil Serv. Comm'n*, 161 W. Va. 154, 154, 241 S.E.2d 164, 165 (1977), overruled on other grounds *West Virginia Dep't of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017) ("The 'liberty interest' includes an individual's right to freely move about, live and work at his chosen vocation, without the burden of an unjustified label of infamy. A liberty interest is implicated when the State makes a charge against an individual that might seriously damage his standing and associations in his community or places a stigma or other disability on him that forecloses future employment opportunities.").

[45] See Syl. pt. 3, *Waite v. Civil Serv. Comm'n*, 161 W. Va. 154, 154, 241 S.E.2d 164, 165 (1977), overruled on other grounds *West Virginia Dep't of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017) ("A 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings.").

61

4. To report to the House of Delegates its findings of facts and any recommendations consistent with those findings of fact which the Committee may deem proper.

The record demonstrates that the Judiciary Committee was aware that it failed to carry out the above duties, but refused to correct the error. The following exchange occurred during the proceedings in the House regarding the failure to follow Rules 3 and 4:

> MINORITY VICE CHAIR FLUHARTY: Thank you, Mr. Chairman. Counsel, I was going through these Articles. Where are the findings of fact?
> MR. CASTO: Well, there--there are no findings of fact there. The Committee--
> MINORITY VICE CHAIR FLUHARTY: Where?
> MR. CASTO: I said, sir, there are no findings of fact.
> MINORITY VICE CHAIR FLUHARTY: There are no findings of fact? All right. Have you read House Resolution 201?
> MR. CASTO: I have sir, but I have not read it today.
> MINORITY VICE CHAIR FLUHARTY: Well, do you know that we're required to have findings of fact?
> MR. CASTO: I think, sir, that my understanding is--based upon the Manchin Articles--that the term "findings of fact" which was used at the same time, that the profferment of these Articles is indeed equivalent to a findings of fact. The--but that, again, is your interpretation, sir.
> MINORITY VICE CHAIR FLUHARTY: So based upon the clear wording of House Resolution 201, it says we're "To make findings of fact based upon such investigation and hearings;" and "To report to the Legislature its findings of facts and any recommendations consistent with those findings of facts which the Committee may deem proper." I mean, you're--you're aware how this works in the legal system. You draft separate findings of fact. I'm just wondering why we haven't done that.
> MR. CASTO: Because, sir, that is not the manner in which impeachment is done.
> MINORITY VICE CHAIR FLUHARTY: Well, findings of fact in House Resolution 201 are referenced separate from proposed Articles of Impeachment. Am I wrong in that observation?
> MR. CASTO. I don't believe that you're wrong in that.

The record also discloses that the Judiciary Committee was warned by one of its members of the consequences of its failure to follow its own rules:

MINORITY CHAIR FLEISCHAUER: Thank you, Mr.--thank you, Mr. Chairman. I think the gentleman has raised a valid point. If we look at the Resolution that empowers this Committee to act, it--it says that we are to make findings of fact based upon such investigation and hearing and to report to the House of Delegates its findings of fact and any recommendations consistent with those findings, of which the Committee may deem proper.

\*\*\*

And I'm just a little concerned that if we don't have findings of fact that there could be some flaw that could mean that the final Resolution by the House would be deemed to be not valid.

\*\*\*

So I think we--if there--there would be some wisdom in trying to track the language of the Resolution, and it would be consistent with any other proceeding that we have in West Virginia that when there are requirements of findings of fact and--in this case, it's not conclusions of law, but it's recommendations--that we should follow that.

As previously stated, the Petitioner has also asserted that the House of Delegates failed to adopt a resolution of impeachment. Rule 2 of the last Further Resolved section of Resolution 201 provides as follows:

> Further resolved ... that the House of Delegates adopt a resolution of impeachment and formal articles of impeachment as prepared by the Committee; and that the House of Delegates deliver the same to the Senate in accordance with the procedures of the House of Delegates, for consideration by the Senate according to law.

A review of the Articles of Impeachment that were submitted to the Senate unquestionably shows that the House of Delegates failed to include language indicating that the Articles were adopted by the House.

We are gravely concerned with the procedural flaws that occurred in the House of Delegates. Basic due process principles demand that governmental bodies follow the rules they enact for the purpose of imposing sanctions against public officials. This right to due process is heightened when the Legislature attempts to impeach a public official.

63

Therefore we hold, in the strongest of terms, that the Due Process Clause of Article III, § 10 of the Constitution of West Virginia requires the House of Delegates follow the procedures that it creates to impeach a public officer. Failure to follow such rules will invalidate all Articles of Impeachment that it returns against a public officer.

We must also point out that the Petitioner was denied due process because none of the Articles of Impeachment returned against her contained a statement that her alleged wrongful conduct amounted to maladministration, corruption, incompetency, gross immorality, neglect of duty, or any high crime or misdemeanor, as required by Article IV, § 9 of the Constitution of West Virginia. This is the equivalent of an indictment failing to allege the essential elements of wrongful conduct. See Syl. pt. 1, *State ex rel. Combs v. Boles*, 151 W. Va. 194, 151 S.E.2d 115 (1966) ("In order to lawfully charge an accused with a particular crime it is imperative that the essential elements of that crime be alleged in the indictment.").

## V.

## CONCLUSION

We have determined that prosecution of Petitioner for the allegations set out in Article IV, Article VI and Article XIV of the Articles of Impeachment violates the separation of powers doctrine. The Respondents do not have jurisdiction over the alleged violations in Article IV and Article VI. The Respondents also do not have jurisdiction over the alleged violation in Article XIV as drafted. In addition, we have determined that the failure to set out findings of fact, and to pass a resolution adopting the Articles of Impeachment violated due process principles. Consequently, the Respondents are

prohibited from proceeding against the Petitioner for the conduct alleged in Article IV and Article VI, and in Article XIV as drafted. The Writ of Prohibition is granted. The Clerk is hereby directed to issue the mandate contemporaneously forthwith.

Writ granted.